**In the Matter of James P. BUTLER, Bankrupt,**

**James P. Butler, Appellant.**

**No. 18257.**

United States Court of Appeals, Third Circuit.

Argued March 17, 1970.

Decided April 17, 1970.

Robert B. Wasserman, Newark, N.J. (John J. McLaughlin and Myron S. Lehman, Newark, N.J., on the brief), for appellant.

Kenneth S. Stein, Hunziker, Hunziker & Stein, Paterson, N.J., for appellee.

Before McLAUGHLIN, FREEDMAN and GIBBONS, Circuit Judges.

## OPINION OF THE COURT

FREEDMAN, Circuit Judge.

This case, involving an individual bankrupt's right to discharge, is before us for the second time. The bankrupt appeals from an order of the district court affirming the referee's denial of his discharge.

### I.

The bankrupt, James P. Butler, was an employee of Miller & Van Winkle Company, a New Jersey corporation. On November 15, 1960, the corporation was indebted to the Franklin Bank for $28,-195.87 on an unsecured, overdue note. In order to obtain a new loan the corporation entered into an accounts receivable financing agreement with the Bank. The agreement was signed on behalf of the corporation by Robert J. Cormier, its president, Butler, its treasurer, and Michael Terminiello, its secretary. Next day the corporation delivered to the Bank its promissory note for $50,000, together with an assignment of accounts receivable supported by invoices totalling $62,580 which falsely showed shipments of certain machinery to customers. Payment of the promissory note was personally guaranteed by Butler and Cormier. The Bank then credited $50,-000 to the corporation, receiving from it the satisfaction of the corporation's outstanding debt. At various times thereafter the corporation assigned to the Bank other accounts receivable and substituted invoices for some of those involved in the November 16, 1960 assignment. All these assignments, which were executed on behalf of the corporation by Butler as treasurer, were false; the machinery shown on the invoices had not been shipped and the customers shown on the assignments were not indebted to the corporation.

The corporation later went into bankruptcy and the Bank obtained judgment against Butler on his personal guarantee for $15,121.59, the balance due on the note. Butler then filed a voluntary petition in bankruptcy and the Bank, which filed a proof of claim for the amount of its judgment, objected to his discharge.

Butler had been employed by the corporation from February 1960 to March 1961 when it went into bankruptcy. From the commencement of his employment Butler held the office of treasurer, but was not a director of the corporation. He owned 2% of its outstanding capital stock.

The Bank objected to Butler's discharge under § 14(c) (3) of the Bank-

ruptcy Act[1] on the ground that as an executive of the corporation he had obtained for it the loan of $50,000 by making what he knew were materially false and fraudulent statements regarding the corporation's financial condition.

After a hearing the referee dismissed the Bank's objections on the ground that the assignments of the accounts receivable were not statements of financial condition within the meaning of § 14(c) (3). The district court vacated the referee's order and remanded the case to him because he had made no findings which would disclose whether the assignment of the accounts receivable constituted a financial statement, and also ordered that if they were the referee should decide whether Butler was an "executive" of the corporation within the meaning of § 14(c) (3).

After a further hearing the referee, on October 26, 1967, denied the application for a discharge. He made findings of fact that the assignments of the accounts receivable to the Bank were materially false statements in writing respecting the financial condition of the corporation, that the Bank relied on these assignments in extending credit to the corporation, that Butler was treasurer of the corporation and represented it in the dealings with the Bank following the execution of the accounts receivable financing agreement, and that he was an executive of the corporation within the meaning of § 14(c) (3). The referee further found that except for the possible effect on the continuation of his employment, the bankrupt received no benefit, direct or indirect, by engaging in the accounts receivable financing with the Bank. The referee concluded that there was no requirement in the law that the executive of a corporation receive a benefit from the transaction. The district court affirmed the referee's order. From this decision the first appeal was taken to this court.

The appeal attacked the referee's decision that Butler was an "executive of a corporation" within the meaning of § 14 (c) (3). We refused to decide that question, however, but remanded the case because the record did not contain any finding on the important and underlying question of Butler's knowledge, or reckless indifference amounting to the equivalent of knowledge, of the falsity of the accounts receivable. In re Butler, 407 F.2d 1059 (3 Cir. 1969). We referred to our recently decided case of In re Barbato, 398 F.2d 572 (3 Cir. 1968) (en banc), where in similar circumstances we had remanded a bankruptcy discharge case to the referee to determine whether there was either knowledge of the falsity of the financial statement or a reckless indifference to the facts.

On remand the parties agreed to have the referee decide the question on the existing record without additional testimony. The referee thereupon found that:

"Mr. Butler either knew or should have known that the accounts were fictitious.

"Specifically I find that he was recklessly indifferent in not knowing at the time the assignments of accounts receivable were made to the Franklin Bank that they constituted materially false statements in writing respecting the financial condition of Miller & Van Winkle Company."

He accordingly entered an order denying the discharge. The district court affirmed the order, and from this decision the present appeal was taken.

---

1. "(c) The court shall grant the discharge unless satisfied that the bankrupt has * * *

"(3) while engaged in business as a sole proprietor, partnership, or as an executive of a corporation, obtained for such business money or property on credit or as an extension or renewal of credit by making or publishing or causing to be made or published in any manner whatsoever a materially false statement in writing respecting his financial condition or the financial condition of such partnership or corporation; * * *" 11 U.S.C. § 32(c) (3) as amended.

## II.

It is argued first that the referee's finding that Butler was recklessly indifferent is clearly erroneous.

Much emphasis is placed by Butler on his testimony that he was employed as an office and personnel manager and had no voice in the policy or the financial decisions of the corporation, that he had nothing to do with sales or accounts receivable but merely was given completed snap-out forms which he was directed to submit to the Bank, and that he had no knowledge regarding the validity of the accounts receivable but was merely following the orders of the president. Butler further relies on the testimony of Albert E. Riss, a former employee of the corporation, who stated that Cormier was the dominant party who "ran the show," personally supervised the sales operation, and alone decided what was a sale. Riss asserted that Butler was only an office manager and was in no position to determine whether an account receivable was legitimate. Indeed, the referee himself said that he felt sorry for Butler because "anyone who has been involved in the case realizes that the president ran the show for good or ill of those involved."

On the other hand, the president of the Bank, John C. Biggins, testified that in a discussion in the presence of the Bank's attorney on March 15, 1961, Butler indicated that he knew the invoices of the original and substitute accounts receivable were fraudulent at the time they were presented to the Bank, and that they had been prepared under his direction. Moreover, Butler himself admitted that he held himself out to the Bank as treasurer of the corporation, that there was no reason why it should not have relied upon this in dealing with him, and that at no time did he advise the Bank that he was acting under the direction of the president although he thought it should have been obvious.

This summarization is enough to show that there is sufficient evidence in the record to support the referee's finding that even if Butler did not know that the accounts receivable were false, he acted with reckless indifference in effectuating the transaction as treasurer of the corporation in total ignorance of the true facts. The testimony of Butler and Riss would have greater meaning if the question were whether Butler knew that the accounts receivable were fraudulent. But the referee found that Butler was recklessly indifferent, and however much the record might have justified a finding in the bankrupt's favor, we cannot say that the finding against him was clearly erroneous. General Order in Bankruptcy 47; Federal Rule of Civil Procedure 52(a).

## III.

We turn then to the second question involved, whether Butler was an "executive" of the corporation.

Prior to 1960, § 14(c) (3) of the Bankruptcy Act provided:

"(c) The court shall grant the discharge unless satisfied that the bankrupt has * * *

"(3) Obtained money or property on credit, or obtained an extension or renewal of credit, by making or publishing or causing to be made or published in any manner whatsoever, a materially false statement in writing respecting his financial condition; * * * *"

Under this provision an individual who acted on behalf of a corporation in making a financial statement was not barred from a discharge in his own bankruptcy, because it was the corporation rather than the individual who had "obtained" the money, property, or credit, and also because the statement related to the financial condition of the corporation rather than to "his [i. e., the individual's] financial condition." In these circumstances, there developed what has been called the "indirect benefit doctrine" under which the bar to discharge was made applicable to the individual bankrupt if he had a substantial pecuniary interest in the corporation, on a theory akin to

piercing the corporate veil. See Levy v. Industrial Finance Corp., 276 U.S. 281, 48 S.Ct. 298, 72 L.Ed. 572 (1928) (Holmes, J.); In re Marcus, 253 F.2d 685 (2 Cir. 1958); In re Leichter, 197 F.2d 955 (3 Cir. 1952), cert. denied Devorsky v. Leichter, 344 U.S. 914, 73 S.Ct. 336, 97 L.Ed. 705 (1953); In re Bernstein, 197 F.2d 378 (7 Cir. 1952); Wilensky v. Goodyear Tire & Rubber Co., 67 F.2d 389 (1 Cir. 1933); Royal Indemnity Co. v. Cooper, 26 F.2d 585 (4 Cir. 1928).

In 1960 Congress amended § 14 (c) (3) by adding the language here italicized:

"(c) The court shall grant the discharge unless satisfied that the bankrupt has * * *

"(3) *while engaged in business as a sole proprietor, partnership, or as an executive of a corporation,* obtained *for such business* money or property on credit or as an extension or renewal of credit by making or publishing or causing to be made or published in any manner whatsoever a materially false statement in writing respecting his financial condition *or the financial condition of such partnership or corporation*; * * *." [2]

The main purpose of the amendment was to put an end to the practice of small loan creditors who often condoned or even encouraged individual, non-commercial borrowers to make financial statements omitting other debts, with the intention of using the false statements to preserve their claim in the event the borrower went into bankruptcy.[3] The Senate report approved the comments of the House Judiciary Committee:

"[I]t is desirable to eliminate the false financial statement as a ground for the complete denial of a discharge insofar as the individual noncommercial bankrupt is concerned. * * * [T]he nonbusiness debtor normally issues his financial statement to a particular creditor as part of his application for credit or for a loan. That creditor already has the protection of nondischargeability under § 17 [which preserves a debt after a discharge if the debtor obtained the credit by publishing a false financial statement with intent to deceive]. * * * The situation is somewhat different in the case of a business bankrupt. The businessman is more likely to be aware of the severe consequences to him of issuing a false financial statement. His ordinary business records enable him to produce a more accurate statement than a householder who may have a multitude of small debts and no records. Furthermore, the financial statement issued by a businessman is frequently for the purpose of establishing credit standing in a community. His creditors may never see the financial statement itself." [4]

In accomplishing its primary purpose of eliminating non-business financial statements from the ground for the bar to a discharge, Congress, in the clearest terms, included in the bar one who was engaged in business either as sole proprietor, as a partner, or as an executive of a corporation, and as such obtained for the business money, property, or credit by making a false financial statement regarding his own financial condition or the condition of the business. There is nothing in the statute to require that the executive of the corporation be the sole or controlling stockholder and the "indirect benefit doc-

2. 74 Stat. 408 (1960); 11 U.S.C. § 32(c) (3) as amended.

3. The creditor would either obtain an individual's agreement to pay the debt in full in return for the creditor's agreement not to oppose the discharge or would simply assert in a state court suit that the false financial statement barred discharge of the debt. S.Rep.No.1688,

86th Cong., 2d Sess. (1960) reprinted in 1960 U.S.Code Cong. & Admin.News, Vol. 2 at pp. 2954–2956. See Note, Bankruptcy Act: Abuse of Sections 14C(3) and 17A(2) by Small Loan Companies, 32 Ind.L.J. 151 (1957).

4. S.Rep.No.1688, 86th Cong.2d Sess. (1960) reprinted in 1960 U.S.Code Cong. & Admin.News, Vol. 2 at pp. 2954–2956.

**52**

trine" has lost the foundation for its existence.[5]  The statute now makes the bar applicable to an individual who is engaged in business and in its relevant provision applies to him if he is an executive of the corporation for which he has obtained money, property, or credit by making a false financial statement respecting its condition.  The question therefore simply is whether Butler acted as an "executive" of the corporation.

It is argued that he was not an executive because he was not a director, owned but a small amount of stock, and was entirely subordinate to the president, who "ran the show."  Butler also relies on In re Gold, 93 F.2d 676 (3 Cir. 1937), where we said that under New Jersey's corporation law the president and vice president of a corporation are executive officers and the secretary and treasurer are ministerial or administrative officers.

 In determining the question now before us it is not decisive whether the treasurer of a corporation is by virtue of his position an executive or an administrative officer, just as it is not decisive whether he is a director or owns stock of the corporation.  For the amendment is not directed to the holder of a corporate office, but instead to one who is engaged in carrying on the business of a corporation in an executive capacity.[6]  Such a person need not be an officer of the corporation nor the owner of any of its stock.  His sole function may be that of an employee.  Whether he meets the statutory description of an "executive" of the corporation will depend not simply on what title he holds but on all the circumstances which surround his conduct, especially on what is reflected toward the creditor with whom he deals on behalf of the corporation. The determination whether one is an "executive" of a corporation is not a technical question but a practical one to be determined in the light of business usage and experience.

The referee might have accepted Butler's contention that his status was in fact insignificant and that the Bank must have been aware of it despite his corporate title and his active role in the transaction.  But the referee, to whom is entrusted the primary role of determining the weight of the evidence and the inferences which may be fairly drawn from it, found to the contrary.  His factual finding is not so devoid of support that we may condemn it as clearly erroneous.

The order of the district court, therefore, will be affirmed.

---

5.  See In re Wells, 248 F.Supp. 224 (N.D. Ala.1965).

6.  Dunn v. Arutt, 422 F.2d 501 (2 Cir. February 20, 1970).