**In the Matter of Harvey LURIE, Bankrupt.**

**No. 71 B 307.**

United States District Court, E. D. New York.

Nov. 27, 1974.

Jaspan & Kaplan, by A. Thomas Levin, Garden City, N. Y., for bankrupt-appellant.

Hahn, Hessen, Margolis & Ryan, by Daniel A. Zimmerman, New York City, for objecting creditor-appellee.

## MEMORANDUM OF DECISION

NEAHER, District Judge.

The bankrupt ("Lurie") has petitioned for review of a bankruptcy judge's order denying him a discharge because of an objection filed by a judgment creditor, John P. Maguire & Co., Inc. ("Maguire"), pursuant to § 14(c) (3) of the Bankruptcy Act ("Act"),

11 U.S.C. § 32(c)(3).[1] Of three specifications in Maguire's objection, the only one before this court, and the basis for this review, is specification 3.[2] In sustaining it as a bar to Lurie's discharge, the judge's ultimate conclusion was:

"3. The bankrupt, while engaged as an executive of Pennant Knitting Mills, Inc., obtained money for Pennant from John P. Maguire & Co., Inc., in the sum of $52,872.69 by causing materially false statements to be made and published, in writing, respecting the financial condition of Pennant."[3]

■ That conclusion rests upon a number of separate findings of fact and conclusions of law explained in the judge's accompanying memorandum, n. 3 *supra*. These were distilled from over 600 pages of testimony and numerous documentary exhibits. Factual findings must be accepted unless found "clearly erroneous" under the test of Rule 52(a), F.R.Civ.P. In re Davis, 404 F.2d 312, 314 (2 Cir. 1968); In re Tabibian, 289 F.2d 793, 795 (2 Cir. 1961); see Bankruptcy Rule 810.[4] And where the credibility of the bankrupt is an important factor, "the scope of review should be relatively narrow." 289 F.2d at 795.

While Lurie's credibility was surely an issue before the bankruptcy judge, the court is of opinion that it cannot be viewed as a controlling factor in resolving the principal questions tendered by the creditor's objection. A searching review of the evidence discloses serious gaps in Maguire's *prima facie* showing, as well as material facts not dependent upon Lurie's credibility, which render clearly erroneous the critical findings as to Lurie's knowledge, intent and responsibility in the circumstances disclosed. For the reasons which follow, the court is convinced that on the whole record a denial of discharge to Lurie cannot be

---

1. That section provides, where pertinent:

"(c) The court shall grant the discharge unless satisfied that the bankrupt has . . . (3) while engaged . . . as an executive of a corporation, obtained for such business money . . on credit . . . by making or publishing or causing to be made or published in any manner whatsoever a materially false statement in writing respecting . . . the financial condition of such . . . corporation; . . . *Provided,* That if, upon the hearing of an objection to a discharge, the objector shall show to the satisfaction of the court that there are reasonable grounds for believing that the bankrupt has committed any of the acts which, under this subdivision, would prevent his discharge in bankruptcy, then the burden of proving that he has not committed any of such acts shall be upon the bankrupt."

2. That specification reads:

"The bankrupt, while engaged as an executive of Pennant Knitting Mills, Inc. ("Pennant"), obtained money for Pennant from John P. Maguire & Co., Inc. ("Maguire"), in the sum of $52,872.69, by causing materially false statements to be .made and published, in writing, respecting the financial condition of Pennant. These statements consisted of written assignments of invoices representing accounts receivable allegedly due and owing from Robert Bruce, Inc. ("Bruce") to Pennant. These statements were materially false in that they warranted that the monetary figure appearing on the attached invoices was correct, and represented a valid debt for which no offsets, deductions, counterclaims, liens, objections, or claims existed. Said invoices were in fact subject to almost complete setoffs by Bruce. All the facts regarding the Pennant-Bruce transactions in which the setoffs were created and invoices written up and assigned to Maguire were known to the bankrupt herein and the aforesaid assignments were executed with his full knowledge and connivance. Maguire relied on the veracity of such statements in paying over the aforesaid moneys to Pennant."

3. Bankruptcy Judge's Findings of Fact, Conclusions of Law and Memorandum dated April 12, 1973.

4. See also 1A Collier on Bankrupty ¶14.65 (14th ed. 1971); 2 *id.* ¶25.30[2]; 5A J. Moore, Federal Practice ¶52.03[2] (2d ed. 1974). However, findings of fact based on an erroneous view of the law are not binding, nor are findings on mixed questions of law and fact which involve an error of law. United States v. United States Gypsum Co., 333 U.S. 364, 394–396, 68 S.Ct. 525, 92 L. Ed. 746 (1948). See 5A J. Moore, *supra,* ¶¶52.03[2], 52.05[1].

sustained and that the judge's order must be reversed. Bankruptcy Act § 2, sub. a(10), 11 U.S.C. § 11(a)(10).

## Background Facts

The facts germane to the relationship between Lurie and Maguire which eventually led to this personal bankruptcy proceeding began in June 1968. Lurie, now a textile salesman for another company, was then employed as sales manager of Pennant Knitting Mills, Inc. ("Pennant"), a small manufacturer of knitted piece goods of which his former father-in-law, Selig Kaplan, was president, sole active officer and 50% stockholder. On June 4, 1968, Kaplan, in order to obtain needed working capital, executed a factoring agreement appointing Maguire as Pennant's "Factor with respect to all sales of its merchandise or rendition of services to customers in the United States and Canada" and assigning "all accounts receivable arising out of such sales or services." Maguire Exh. 3. Pennant warranted in the agreement that each account receivable so assigned would be "based upon bona fide sale and delivery of merchandise or rendition of services" and "that the customer is obligated to pay the full amount at maturity without defense, counterclaim or offset; and that all documents in connection therewith are genuine" (id.).

Also on June 4, 1968, both Kaplan and Lurie, as the other 50% stockholder, executed individual guaranties of payment in favor of Maguire "[i]n order to induce" the latter to enter into the factoring agreement. Maguire Exh. 11. Lurie thereby agreed that if Pennant became insolvent or bankrupt, his obligations to Maguire under the guaranty would "forthwith become due and payable without notice" (id.).

Maguire promptly began advancing substantial amounts of cash to Pennant in exchange for the assignment of very much larger invoice billings to Pennant's customers due and payable in 60 days. For example, during June 1968, Maguire advanced $144,200 cash against assigned Pennant invoices totaling $221,886.09. Maguire Exh. 13. Operations under the factoring agreement continued throughout the June–December 1968 period without incident, Pennant maintaining substantial credit balances which reflected the collectibility of its assigned accounts (id.).

During this period Lurie, as Pennant's sales manager, negotiated a transaction with Robert Bruce, Inc. ("Bruce"), a large manufacturer of knitwear, which in prior seasons had supplied yarn to Pennant for conversion into knitted fabric for Bruce.[5] The transaction was concluded on an entirely oral basis between Lurie and Bruce's technical director, Richard Selman, and called for Pennant's manufacture and delivery of knitted fabric to Bruce over a four or five month period extending into April 1969. There is no question that Pennant commenced shipping fabric to Bruce on November 29, 1968 and continued to do so throughout December 1968 and in January 1969. It is also unquestionable that the knitted fabric incorporated yarn of various colors and weights delivered to Pennant by Bruce for that purpose. Nor is there any question that Pennant's invoices to Bruce made no deduction for the cost of the yarn and that Pennant assigned them as accounts receivable to Maguire without informing the latter that it would have to pay Bruce for the yarn used.

On January 28, 1969, Bruce remitted full payment to Maguire for the earliest group of Pennant invoices due in 60 days. Maguire Exh. 7. Bruce made no claim of off-set or deduction for yarn supplied although Lurie on January 13 had written Selman advising him that all invoices had been assigned to Ma-

---

5. Bruce, headquartered in Philadelphia, is a national manufacturer of knitwear having annual sales upwards of $30,000,000 and, as Kaplan testified, of "unimpeachable credit" (Tr. 431, 61).

guire. Maguire Exh. 8. Most, if not all, of the remaining invoices were not due for payment to Maguire until February or March 1969. Maguire Exhs. 6 and 13. Bruce never paid them, the only apparent reason being, as stated by the bankruptcy judge, that they "were rejected upon the ground that it had offsets for unpaid yarn", *supra* n. 3.

Whatever the reason, it is indisputable that Bruce's refusal to pay the remaining invoices to Maguire came only *after* Lurie informed Selman in late January or early February that Pennant would have to suspend operations on Bruce's uncompleted orders for lack of funds. That suspension followed upon the sudden depletion of Pennant's credit balance because of protective action taken by Maguire for reasons unrelated to the Bruce transaction. Pennant had been in dispute with Sunberry Textiles, a dyeing and bonding company, complaining that Pennant goods had been ruined by improper dyeing. Maguire was also the factor for Sunberry and Maguire Exh. 13 shows that in January 1969 Maguire made a charge back of approximately $64,000 against Pennant's account for assigned accounts receivable, which its own witness identified as related to the Sunberry matter (Tr. 479).[6] As of December 31, 1968 Pennant had a credit balance with Maguire of $76,921.-18. After the Sunberry charge back, it was left with a January credit balance of $21,483.64. Maguire Exh. 13.

With the flow of working capital cut off, Pennant closed its doors in or about February 1969 and instituted Chapter XI proceedings in the Southern District of New York, apparently remaining for a time as a debtor in possession. As of August 1969, however, Pennant was adjudicated a bankrupt.

The record is clear that Bruce made no claim in Pennant's insolvency proceedings but is silent as to Maguire's participation therein. It can be safely assumed, however, that Maguire was a creditor with unsatisfied claims against Pennant, for it sued Lurie in the Supreme Court, New York County—presumably upon his individual guaranty—and obtained a judgment against him in the amount of $105,087.85.[7] Maguire thereafter garnisheed his current salary —an event which undoubtedly explains Lurie's effort to discharge the debt in this personal bankruptcy.

### Objecting Creditor's Contentions

Maguire contested Lurie's right to a discharge basically on the contention that Pennant obtained continued cash advances from Maguire by assigning invoices for the shipments to Bruce which were "in fact subject to almost complete setoffs by Bruce" for yarn supplied to Pennant, *supra* n. 2. The assignments were made on printed forms furnished by Maguire which contained the following representation:

"the undersigned [Pennant] warrants and guarantees the validity, the genuineness and correctness of said accounts receivable and that said accounts receivable are not subject to offsets, deductions, counterclaims, liens, objections, or claims." Maguire Exh. 4.

Maguire asserts it relied on these representations, that they were false and that Lurie must be held responsible for their asserted falsity even though it stipulated that none of the assignments were signed by him (Tr. 484). This position is based on contentions that Lurie, as an executive, must be "presumed" to have known the terms of Pennant's factoring arrangement with Maguire and was admittedly aware of Pennant's obligation to pay Bruce for the yarn "sooner or later."[8] At the very least, according to Maguire, Lurie was under an obligation to inform it of the alleged "setoffs." His failure to do so under the

---

6. "Tr. ——" indicates references to transcribed minutes of the hearing on Maguire's objections.

7. Although Kaplan had also executed a guaranty, Maguire did not pursue him (Tr. 90).

8. Maguire's Post-Trial Memorandum at 19–20.

circumstances, Maguire argues, is an indication of either his actual or constructive knowledge that accounts subject to "substantial set-offs" were being assigned or of "reckless indifference" to the facts. These contentions obviously presented mixed questions of fact and law not only with respect to Lurie's role, conduct and responsibility as an executive but also as to the nature of the Pennant-Bruce transaction and the conduct of Bruce.

## The Bankruptcy Judge's Decision

The judge found "[t]hat the statements contained in the assignments of the Bruce accounts receivable that the customer (Bruce) had no offsets or counterclaims were not true and were known by *Pennant* to be untrue", *supra* n. 3, emphasis supplied. Accepting Maguire's contentions, he also found and concluded that Lurie "knew or should have known that the assignments[s] . . . were false in that Bruce had offsets against the accounts receivable", and concluded further that if Lurie "did not have actual knowledge of the falsity . . . he permitted them to continue with reckless indifference to the actual facts and with no reasonable ground to believe that they was [*sic*] in fact correct" (*id.*).

The judge acknowledged in his memorandum that:

"No direct evidence was offered to show that Lurie knew that the Bruce account was being assigned to Maguire or that he knew that the assignment forms were inaccurate because of non-disclosure of the fact that Bruce had a setoff against its claim." *Supra* n. 3.

His findings and conclusions were based entirely on the circumstances of Lurie's executive status and activities as sales manager, the small size of Pennant's business (fifteen employees), and Lurie's interest as a stockholder in having the business succeed.

Undoubtedly, as the judge noted, the evidence of scienter need not be direct. In re Simon Weltman & Co., 2 F. 2d 759, 761 (S.D.N.Y.1924). But circumstantial evidence can prove only facts that flow rationally from it. In *Weltman*, there was no doubt that a financial statement "was very materially false", *id.* at 759. Here, as will appear, the findings regarding Lurie's scienter rest not upon evidence but upon unsubstantiated assumptions that the underlying Bruce invoices were not to be paid to Maguire in full when due, hence were subject to "offsets" or "set-offs" and the assignments therefore false, and that Lurie was under a duty to disclose a fact which was not a fact.

## The Creditor's Burden

Under § 14(c)(3) of the Act, Maguire had the initial burden of producing evidence which established "reasonable grounds for believing" that Lurie had committed the act charged in specification 3, *supra* n. 2. The four essential factors to be shown are: (1) that Lurie was an "executive" of Pennant, (2) that for the purpose of obtaining money for Pennant on credit, he either made or caused a written statement to be made to Maguire respecting Pennant's financial condition, (3) that such statement was "materially false", and (4) that Maguire relied upon it. See Industrial Bank of Commerce v. Bissell, 219 F.2d 624, 625 (2 Cir. 1955). To satisfy the fraud requirement *prima facie,* the creditor's evidence must point to intentional falsity in the written statement and not merely error. *Id.* at 625–626; In re Ostrer, 393 F.2d 646, 649 (2 Cir. 1968); In re Rosenfeld, 262 F. 876, 878–879 (2 Cir. 1919).

Only when all the foregoing elements are shown to the satisfaction of the court does the burden shift to the bankrupt to prove that he has not committed an act barring his discharge. Section 14, sub. c of the Act, 11 U.S.C. § 32(c). Moreover, "[i]n weighing the facts put forward in a contest over a discharge . . . a court should keep in mind the beneficial policy allowing the honest debtor to get a new start in

business and life—and should construe § 14 strictly against the objectors and liberally in favor of the bankrupt." In re Tabibian, *supra*, 289 F.2d at 795; see In re Dunn, 422 F.2d 501, 503 (2 Cir. 1970); In re Ostrer, *supra*, 393 F.2d at 649.

Guided by those principles, we examine the evidence upon which it was found that Lurie had committed the fraudulent act charged by Maguire.

### The "Executive" Issue

The evidence was sufficient to find that Lurie was an executive in the sense of one who performed managerial duties for Pennant in the area of sales. But whether it provided reasonable grounds for believing he was an "executive" for the purposes of § 14(c)(3) is a closer question. The bankruptcy judge, under the mistaken impression that Lurie denied he was an executive, *supra* n. 3, permitted Maguire to devote much of the record to proving a status Lurie had already admitted under oath. Lurie's own petition in bankruptcy filed March 26, 1971, described him as "an executive of Pennant" (Statement of Affairs) and at the hearing he testified that he considered himself an executive "in sales." Tr. 325. Kaplan, testifying for Maguire, acknowledged that Lurie's "main job [was] to see to it that the company could get yarn . . . and could sell its finished product" (Tr. 79–80).

Establishing Lurie's executive status is, however, only the beginning of the inquiry. Section 14(c)(3) of the Act by its terms couples the status of executive with the doing of *acts* which will bar his discharge. In re Butler, 425 F.2d 47 (3 Cir. 1970), cited by the judge, where the legislative history of the 1960 amendment to § 14(c)(3) is reviewed, makes this clear. As the court there noted,

"[w]hether he meets the statutory description of an 'executive' of the corporation will depend not simply on what title he holds but on all the circumstances which surround his conduct, especially on what is reflected *toward the creditor with whom he deals* on behalf of the corporation. The determination whether one is an 'executive' of a corporation is not a technical question but a practical one to be determined in the light of business usage and experience." [9]

Maguire's proof on the acts aspect of the "executive" issue was notably deficient. As already indicated, Maguire stipulated at the close of its case that Lurie had not signed the allegedly false assignments, *supra* p. 788; and the judge found "no direct evidence" that Lurie knew the assignments were being made or were "inaccurate", *supra* p. 789. These findings were compelled by Maguire's own proof.

Nor was there any basis for inference that Lurie had any responsibility regarding the making of the assignments in question. Thus Mildred Nesses, Pennant's bookkeeper and general office worker for some ten years, called by Maguire, testified she assigned all accounts receivable to Maguire—a fact confirmed by the assignment forms themselves, which bear her signature for Pennant. Maguire Exh. 4; Tr. 158, 159, 161. Her instructions concerning accounts receivable came not from Lurie but from Kaplan and two Maguire employees, David Goldberg and "David" Miller (Tr. 161).[10] She followed standard Pennant office procedure in making the assignments to Maguire on the basis of bills of lading, shipping memos and invoices given her by Pennant's production department "that were credit approved" (Tr. 161).

---

9. 425 F.2d at 52 (emphasis supplied). Moreover, as one commentator has suggested, the term "executive" as used in the amendment appears to be aimed at corporate employees "who have responsibility for the preparation of financial statements to be used for the procurement of credit." 1A Collier on Bankruptcy ¶ 14.37 at 1386.

But whether that is so it is unnecessary to decide here.

10. The witness undoubtedly intended to refer to Stanley S. Miller of Maguire, who testified that "the bulk of my conversations were with Mrs. Nesses" in connection with the assigning of Pennant's accounts receivable (Tr. 432, 442).

Corroborating the Nesses testimony, Kaplan, also a Maguire witness, testified he initially assumed the responsibility of signing all assignments of Pennant invoices to Maguire (Tr. 54). He did this until illness kept him from the office part of the time, when "the bills were assigned to the factor by the bookkeeper with her signature on them" (*id.*). And it was not his understanding that Lurie would "okay" the assignments before the bookkeeper signed and sent them out (*id.*)

Terry Tratner, production manager of Pennant during 1967–1969, although testifying on the bankrupt's case, also corroborated the essentials of the Nesses testimony. Describing his own role at Pennant as an "executive", Tratner testified he reviewed and distributed all incoming correspondence, wrote up customer sales order contracts; purchased yarn; scheduled the machinery, finishing and other operations necessary to complete the orders; arranged for delivery; and approved all invoice billings to customers which he would then turn over to Miss Nesses for submission to Maguire (Tr. 500–02). Included were the Pennant invoices here in question, which were prepared as each finished shipment to Bruce went out (Tr. 519–21, 557–58). He wrote up incoming Bruce purchase orders for fabric as late as January 21, 1969, which specified delivery to Bruce in March (Tr. 529; Bankrupt's Exh. A).

From the Maguire testimony alone it is obvious that a vicarious responsibility for fraud was imposed on Lurie not because of any acts or actual knowledge on his part as an executive but solely because of a presumption that he must have or should have been aware of what was going on. The bankruptcy judge inferred Lurie's constructive knowledge of, or "reckless indifference" to the alleged fraud because, as he put it,

"Pennant was too small a company for each of these individuals not to know what the other was doing, what made the business succeed or fail, where the business was coming from, where the funds to pay salaries and maintenance were coming from, and of course, that the accounts payable were being financed through the Maguire Company." *Supra* n. 3.

Such a standard of executive responsibility falls little short of guilt by association and is wholly incompatible with the policy of the Act which favors discharge. It finds no support in the statutory language or in any of the cases referred to in the judge's memorandum or in those cited to the court on this review.[11]

Section 14(c)(3) of the Act by its terms requires *prima facie* proof of *acts* by an executive which will bar his discharge. He must *make* or *publish* "a materially false statement in writing" or knowingly or recklessly *cause* someone else to do it. This was precisely the case in In re Butler, *supra*, where Butler himself, as corporate treasurer, signed assignments of accounts receivable to a bank for a loan, knowing they were false since "the machinery shown on the invoices had not been shipped and the cus-

11. Assuming *arguendo* that such partnership cases as In re Simon Weltman & Co., *supra*; Morimura, Arai & Co. v. Taback, 279 U.S. 24, 33, 49 S.Ct. 212, 73 L.Ed. 586 (1929); and Woolen Corporation of America v. Gitnig, 33 F.2d 259 (3 Cir. 1929), have any applicability to the situation presented here, it is clear that "reckless indifference" to the falsity of a statement presupposes that the bankrupt, or someone authorized to act for him, In re Lovich, 117 F.2d 612, 614–615 (2 Cir. 1941), actually *make* the statement that is shown to be materially false. See 1A Collier on Bankruptcy ¶ 14.41. Any suggestion to the contrary in the foregoing cases is easily reconciled as arising out of the unique responsibilities and obligations that devolve upon one partner for the wrongful acts of another, both in the common law and in the bankruptcy law. See *id.*, ¶ 14.41 at 1404. Extension of such a nonfeasance theory, even to executives in a close corporation, is not warranted by the statute, by the case law, or by the policies underlying the Act. Nor does this view do violence to the teaching of *Weltman*, that once a materially false statement is shown, the evidence of scienter need not be direct.

tomers shown on the assignments were not indebted to the corporation." 425 F.2d at 48, 50. Of course, Butler, knowing those facts, would have been just as culpable had he caused his secretary or some clerk to sign the assignments to the bank. Nothing of the sort is shown here.

### The "False Statement" Issue

Maguire's evidence also fell far short of establishing reasonable grounds to believe that the Pennant invoices to Bruce were not to be paid in full at maturity but were subject to "offsets" or "setoffs" (the terms appear to be used interchangeably) at the time of assignment to Maguire. This "set-off" contention is the crux of Maguire's claim of "false statement" arising from the representations made in the assignments, *supra* p. 788. Maguire thus had the initial burden of satisfying a court that the Pennant-Bruce transaction contemplated that Bruce was not to pay the assigned Pennant invoices in full when due but was to be credited with the value of the yarn used. If Maguire's evidence established anything, it was to the contrary.

There is no question that the details of the transaction were worked out only between Lurie, acting for Pennant, and Selman, acting for Bruce (Tr. 327, 370). Selman, called on behalf of Maguire, testified that the arrangement was entirely oral in keeping with Bruce's customary practice but backed up by standard Pennant sales order forms for the fabric Bruce desired manufactured (Tr. 381; see Bankrupt's Exh. A).

According to Selman, Pennant had manufactured knitted fabric for Bruce in the 1967 and 1968 seasons, purchasing yarn from a mill which supplied the colors and quality Bruce desired for its own knitting operations. (Tr. 382–83). The negotiation for the 1969 season involved here occurred late in 1968 after Bruce had already purchased its yarn requirements from that mill and Selman told Lurie "I will sell you the yarn instead of you buying it from Cross Cotton Mills" (Tr. 387). Selman was positive there was no discussion with Lurie about Bruce invoicing the yarn to Pennant other than telling him that the cotton yarn trade terms of net thirty days would apply (Tr. 388–89). Selman also testified he had nothing to do with invoicing, was unable to say whether invoices had ever been sent to Pennant, and was unaware of Pennant's nonpayment for the yarn until sometime later (Tr. 390, 392). He conceded that Bruce had filed no claim for the yarn in Pennant's corporate bankruptcy proceedings (Tr. 429).

Lurie, also called on Maguire's case, admitted that Bruce shipped yarn to Pennant to be used in filling the Bruce orders but maintained that Pennant did not "order" the yarn and was not currently invoiced for it (Tr. 347, 344). He testified that Bruce on occasion took back yarn from Pennant to fill its own needs for a particular color since Bruce was currently manufacturing identical fabric (Tr. 345); and that Pennant expected to return unused yarn to Bruce when all orders were completed, at which time Pennant was to be invoiced and make payment only for yarn actually used (Tr. 341, 345, 351). Pennant, on the other hand, according to Lurie, was to invoice and be paid by Bruce on Pennant's usual 60-day net terms as knitted fabric was shipped and without deduction for any Bruce yarn utilized, since it was going to take about four or five months to complete Bruce's orders (Tr. 339, 342, 351, 372). Bruce's accounting vice-president, Allan Smith, called by Maguire, testified that Bruce did in fact pay the earliest group of invoices to Maguire at maturity without claim of offset or deduction for yarn supplied (Tr. 222–23; Maguire Exh. 7).[12]

---

12. Smith also conceded that Bruce on occasion made arrangements such as Lurie described, testifying that "there are certain people that we do send the raw material to and that we might negotiate with at the end of the season" (Tr. 266). He acknowledged having no familiarity with the arrangement worked out between Lurie and Selman (Tr. 218).

Despite the documented corrobration of Lurie's understanding of the transaction and the obvious shortcomings in the Bruce witnesses' testimony, the bankruptcy judge held fast to the setoff theory for the following reason:

> "The bankrupt argues that Pennant had no liability to Bruce for the yarn because (he insists) payment was not to be made until the accounts of one against the other were adjusted at the end of the contract. This, even if true, did not eliminate Bruce as a creditor. It merely delayed the due date of the obligation." *Supra* n. 3.

That view of the Pennant-Bruce transaction begs the question. Maguire cannot bar Lurie's discharge on the ground of fraud simply by showing Bruce was or would be a creditor of Pennant as well as a debtor. Such a common business relationship would not provide "reasonable grounds for believing" that the invoices assigned to Maguire were not bona fide and fully collectible *at the time of assignment*; *i. e.*, did not truly reflect shipments of goods for which Bruce would be obligated to pay.

Where, as here, the assignment of accounts receivable is relied on as the false statement in writing, it must be shown that the underlying accounts receivable were in fact false. That was the situation in each case cited by the bankruptcy judge.[13] It is not the case here. The assigned invoices may not be treated as fraudulent merely because 'at a future "day of reckoning" Pennant admittedly would have to pay Bruce 'for the yarn used. (Tr. 350). Whether Bruce sold the yarn to Pennant as Selman testified (Tr. 386), or the leftover yarn remained the property of Bruce to be returned, as Lurie seemed to think (Tr. 344–45, 351, 376), the record is clear that Bruce was to pay the Pennant invoices according to their terms and had started to do so, fully aware that Pennant had assigned Maguire "all invoices billed to you" (Maguire Exhs. 7, 8; Tr. 222–23, 339, 342, 351, 372).[14]

That Bruce in subsequently refusing to pay Maguire has taken the defensive position that it had a setoff against Pennant (Tr. 235) does not make the assignments false when made.[15] There is no evidence that the group of Bruce in-

13. In re Butler, *supra* (underlying invoices assigned covered shipments not made); Albinak v. Kuhn, 149 F.2d 108 (6 Cir. 1945) (assignments of accounts already collected, or not due and owing, or covering merchandise not manufactured or delivered); In re Bernfeld, 247 F.Supp. 89 (E.D.N.Y.1965) (assignment of post-dated invoices for shipments not fulfilled); In re Simard, 254 F. Supp. 609 (W.D.Ark.1966) (submission of fraudulent invoices or "vouchers" to obtain money and goods).

14. Indeed, each and every Pennant invoice sent to Bruce, including those it paid, bore a sticker label which read:

> "Payable To
> JOHN P. MAGUIRE & CO., INC—
> Factors P. O. Box 2104, New
> York, N.Y. 10008
> By whom this account is owned, remittances to be made only to them in New York funds at par: Any objection to this bill or its terms must be reported to them within ten days after its receipt."

Maguire Exh. 6, Tr. 218.

15. Aside from the lack of evidentiary support for a finding that the statements in the as-

signment forms were in fact false, there is serious doubt whether the Pennant-Bruce arrangement could have contemplated any legally recognizable "setoff." The distinguishing feature of a setoff is that "it arises out of a transaction extrinsic to that out of which the primary claim arose." In re Monongahela Rye Liquors, 141 F.2d 864, 869 (3 Cir. 1944). See Clark v. Manufacturers Trust Co., 169 F.2d 932, 935 (2 Cir. 1948), aff'd in part sub nom. McGrath v. Manufacturers Trust Co., 338 U.S. 241, 70 S.Ct. 4, 94 L.Ed. 31 (1949); Hastorf v. Degnon-McLean Contracting Co., 128 F. 982, 983 (S.D.N.Y.1904). That does not appear to be the case here.

Added conceptual difficulty with the "setoff" theory is evident from Bruce's subsequent failure to avail itself of the statutory right of setoff in Pennant's bankruptcy proceeding, *supra* p. 20, under Section 68 of the Act, 11 U.S.C. § 108. That right would have been available if in fact there had been "mutual debts or mutual credits" between Pennant and Bruce at the time of the Pennant insolvency. *Id.* That would not have

voice copies itemizing yarn shipments to Pennant, Maguire Exh. 5, were in fact sent to Pennant prior to or during the Maguire assignment period or, if so, were intended as billings of yarn shipped. The testimony of Smith that invoices were "normally" sent out by Bruce at time of shipment (Tr. 217) is not acceptable proof that these invoices were so sent. Bruce's normal business was not the sale of yarn but of finished knitwear. The delivery of yarn to Pennant was in the nature of an accommodation which also served Bruce's interest. Smith conceded that the invoice copies bore no credit terms and that an accountant's "Schedule A" to which they were attached was prepared by him after Pennant's insolvency (Tr. 215–16). Pennant's bookkeeper, Nesses, had no clear recollection of seeing such invoices or of Bruce's being listed as an account payable on the monthly schedules she regularly prepared until she left Pennant in February or March 1969 (Tr. 169–70, 195–97). Tratner testified that only shipping memos for yarn were received from Bruce until just before he left Pennant in February 1969, when "a whole slew of invoices [came] in at one shot" (Tr. 519–21, 539). This was after Lurie had called Selman and informed him that Pennant was "in trouble" and that Bruce had better get its yarn out (Tr. 547). Lurie's testimony was similar (Tr. 361).

The "trouble" which precipitated Pennant's insolvency and brought about the abrupt termination of the Bruce transaction—and apparently the sudden appearance of the Bruce yarn invoices—has already been described, *supra* pp. 787–788. It was clearly an event subsequent to the assignments in question and wholly unrelated to the transaction on which those assignments were based. If the Pennant invoices did in fact become uncollectible—even though Bruce concededly received delivery of the goods billed—it was clearly due to subsequent events. Representations as to the bona fides and collectibility of accounts receivable which are true when made are not rendered false by independent subsequent events which later make the accounts uncollectible. See Doyle v. First Nat. Bank of Baltimore, 231 F. 649 (4 Cir. 1916); In re Parker Bros. & Johnson, 279 F. 425 (E.D.N.C.1922).

In this connection, it is worth repeating that until the Sunberry Textile charge back, Pennant's account with Maguire reflected substantial credit balances indicating satisfactory collectibility of accounts receivable assigned (Maguire Exh. 13). David Goldberg, of Maguire, who was in charge of the Pennant account, acknowledged that Maguire had held a 20% reserve against Pennant's outstanding accounts receivable and that as of December 31, 1968, Pennant's account had a credit balance of almost $77,000 (Tr. 453–54). He conceded also that during December 1968 and January 1969 Maguire advanced cash of $65,000 against assignments of Pennant invoices to Bruce totaling $126,000 (Tr. 455). As another Maguire witness, Miller, acknowledged, he approved the credit on the assigned invoices and had he known of such "offsets", he would still have approved, but would have notified the "front office", in which case credit would have been advanced only as to the net due (Tr. 435–37).[16] Whatever was advanced, however, would have been substantially off-set by the $64,000 Sunberry deduction, which Goldberg confirmed (Tr. 479).

On the entire record the conclusion is inescapable that the objecting creditor, Maguire, failed to come forward with evidence showing reasonable grounds to believe that the bankrupt,

---

been the situation if, as Lurie testified he believed, the yarn remained the property of Bruce until a subsequent accounting and invoicing occurred for yarn used. See In re Lykens Hosiery Mills, 141 F.Supp. 891 (S. D.N.Y.1956).

16. According to Lurie, the Bruce yarn involved in manufacturing the fabric invoiced averaged about 20% of the value (Tr. 372). Tratner, who had charge of production operations, estimated it amounted to between $10,000 and $15,000 (Tr. 529–30).

Lurie, had committed an act proscribed by Section 14(c)(3) of the Act, 11 U.S.C. § 32(c)(3), and that the bankruptcy judge's findings and conclusions to the contrary are clearly erroneous. The order denying the bankrupt a discharge is therefore reversed.

So ordered.