In re Emanuel SALZMAN, Debtor.

CHRYSLER CAPITAL CORP., formerly known as E.F. Hutton Credit Corp., Plaintiff,

v.

Emanuel SALZMAN, Defendant.

In re William HAMLIN, Debtor.

CHRYSLER CAPITAL CORP., formerly known as E.F. Hutton Credit Corp., Plaintiff,

v.

William HAMLIN, Defendant.

Bankruptcy Nos. 83 B 20134, 83 B 20068.

83 Adv. 6149, 83 Adv. 6150.

United States Bankruptcy Court, S.D. New York.

June 9, 1986.

Garrity, Connolly, Lewis, Lowry, Grimes & Silverman, New York City, for Emanuel Salzman; Paul H. Silverman and Robert C. Reichelscheimer, of counsel.

Kreindler & Relkin, P.C., New York City, for Chrysler Capital Corp.; S. Robert Schrager and Bruce S. Nathan, of counsel.

William Hamlin, Peekskill, N.Y., pro se.

## DECISION ON OBJECTIONS TO DISCHARGEABILITY

HOWARD SCHWARTZBERG, Bankruptcy Judge.

Plaintiff, Chrysler Capital Corp., has commenced adversary actions against the debtors, Emanuel Salzman and William Hamlin, on the ground that plaintiff's claims against the debtors arising under their written guarantees of payment with respect to the obligations of BFM Printing Corp. ("BFM"), of which they were principal shareholders and officers, should not be discharged pursuant to 11 U.S.C. § 523(a)(2). The two separate adversary actions against the debtors were consolidated for trial purposes on consent of all the parties. The plaintiff alleges that the debtors warranted the validity of receivables assigned to it by BFM and that, nonetheless, the debtors submitted to plaintiff false invoices for which work had not been performed by BFM and forged bills of lading for which merchandise had not been shipped by BFM. The plaintiff further alleges that it advanced funds and extended credit to BFM in reliance upon the validity of the assigned receivables. The plaintiff seeks to except from discharge its claims against the debtors on the ground that the debtors obtained from the plaintiff money and credit for their company, BFM, by reason of false representations, as proscribed by 11 U.S.C. § 523(a)(2)(A). The plaintiff also asserts that the assigned bogus receivables were materially false statements in writing respecting BFM's financial condition on which plaintiff reasonably relied and which were caused to be made by the debtors with intent to deceive the plaintiff, and which in fact, did deceive the plaintiff to its detriment.

The debtors in their answers neither admit nor deny the allegations set forth in the complaint on the ground that their answers might tend to incriminate them. In addition to claiming their rights under the Fifth Amendment, the debtors each asserted an affirmative defense that the complaint fails to state a claim upon which relief can be granted.

Emanuel Salzman did not attend the trial although his counsel called witnesses and submitted evidence in his defense. William Hamlin did attend the trial as a *pro se* defendant, relying upon the presentation submitted by Salzman's counsel. When called by the plaintiff to testify, William Hamlin refused to answer any questions on the ground that his answers might tend to incriminate him.

## FINDINGS OF FACT

1. The debtor, Emanuel Salzman, filed with this court his voluntary petition for relief under Chapter 7 of the Bankruptcy Code on March 15, 1983.

2. The debtor, William Hamlin, filed with this court his voluntary petition for relief under Chapter 7 of the Bankruptcy Code on February 9, 1983.

3. Emanuel Salzman and William Hamlin were the president and secretary, respectively, of BFM Printing Corp., a corporation engaged in the printing business in Croton-on-Hudson, New York. They were also the sole shareholders of BFM, which they formed in 1976.

4. On September 21, 1979, each of the debtors executed a written guarantee in favor of International Paper Credit Corporation ("IPCC") in order to induce IPCC to make loans or advances, or to extend credit to their corporation, BFM. Each guarantee provides that it is a continuing guaranty and that the obligations of the guarantor "shall inure to the benefit of IPCC's successors and assigned." (Exhibits 16, 17).

5. On March 11, 1980, BFM entered into a financing agreement whereby BFM agreed to assign to IPCC all of BFM's accounts receivable as security for advances and loans to be made by IPCC to BFM. (Exhibit 15). IPCC agreed to make loans and advances to BFM up to 80% of the accounts receivable upon receipt of a schedule confirming the assignment of BFM's accounts receivable. Thereafter, IPCC made loans and advances to BFM secured by a pool of BFM's pledged collateral consisting of accounts receivable and inventory.

6. On May 15, 1981, IPCC filed with the Secretary of State of Delaware, the state of its incorporation, a certificate of amendment of its certificate of incorporation, changing the name of the corporation to E.F. Hutton Credit Corporation. (Exhibit 3).

7. On August 2, 1985, E.F. Hutton Credit Corporation filed with the Secretary of State of Delaware, a certificate of amendment of its certificate of incorporation changing the name of the corporation to Chrysler Capital Corporation. (Exhibit 4). The pleadings in this case, which originally designated E.F. Hutton Credit Corporation as the plaintiff, were amended during the trial to reflect the plaintiff's change of name to Chrysler Capital Corporation.

8. There was no evidence of any change in the operation or management of the plaintiff corporation other than the two successive name changes.

9. In addition to making loans and advances to BFM secured by BFM's accounts receivable, the plaintiff, through its division known as National Vendor Business ("NVB") advanced funds to BFM secured by BFM's machinery and equipment. In February of 1982, BFM's delinquency to the plaintiff's NVB division amounted to approximately $60,000.

10. In March of 1982, plaintiff's NVB division agreed with BFM to a six month extension on the $60,000 delinquency, with the understanding that the plaintiff's accounts receivable financing division would wire payments for BFM's assigned receivables directly to the NVB division. The plaintiff's inter-office memorandum reflecting this procedure (Exhibit D) states:

This procedure should insure that funds will be available to service the NVB indebtedness.

\* \* \* \* \* \*

The direct payments which Commercial Finance will transfer to NVB should serve to reduce NVB's exposure while not eroding the Commercial Finance and/or the overall corporate collateral base.

/(2) It should be noted that if the client's sales increase, operations remain profitable, and the NVB delinquency is brought under control, there could be a future need to provide an additional increase in the Commercial Finance line. In any event the account will continue to be monitored on a daily basis and any future line increases would be totally dependent upon operations continuing to be profitable.

By this procedure, portions of funds that the plaintiff would normally advance to BFM for assigned accounts receivable would not be transmitted to BFM, but would be applied by the plaintiff's bookkeeping entries as wired to the plaintiff's NVB division in reduction of the NVB division's exposure with respect to BFM's de-

linquency under its secured machinery and equipment obligation. In effect, funds to which BFM would normally be entitled for assigned receivables would be applied by the plaintiff as an offset against the BFM's machinery and equipment delinquency to the plaintiff's NVB division.

11. A transaction synopsis attached to Exhibit D reflects that as of the end of March, 1982, BFM's net outstanding machinery and equipment obligation to the plaintiff's NVB division was $1,040,000. BFM's maximum commercial accounts receivable line of credit was then $750,000, for a total maximum investment by the plaintiff of $1,790,000.

12. During the course of the plaintiff's dealings with BFM, the plaintiff routinely monitored the accuracy of BFM's outstanding accounts receivable by mailing letters to the various account debtors on the letterhead of Robert H. Carr and Company, a fictitious auditing firm name adopted by the plaintiff, pursuant to which an audit verification was sought as to the accuracy of the account debtors' obligations to BFM. (Exhibit F).

13. Plaintiff also monitored the BFM assigned receivables by dispatching field examiners to visit the BFM premises to examine BFM's records of sales and receivables. The field examiners made written reports and recommendations which were transmitted to the plaintiff's loan officers. (Exhibits K-1, L, L-1). The plaintiff was interested in reducing BFM's delinquency to the plaintiff's NVB division's machinery and equipment account by fixed amounts of $7800 every week for a period of twenty-six weeks by means of the offsetting transfers from assigned accounts receivable which BFM transmitted to the plaintiff's commercial finance division. This point was expressed in the plaintiff's inter-office report as follows: (Exhibit M)

It is best to wire every week for the next 26 weeks (4–5 thru 9–30) *never less than* $7200.00 (26 × $7200.00 = $187,200.00) This is the *minimum* to handle the payments. *If* BFM doesn't squeal like a pig, we best take more when available, but

not more than $8500.00 depending upon availability. I don't want them pay [sic] interest on funds held by us for future payments.

14. One of the plaintiff's field examiners, Brad Mitch, noted a discrepancy with respect to one of the plaintiff's account debtors, Rudco Industries, which he reported to the plaintiff's loan officer, Thomas F. Maher, in a printed report form dated June 7, 1982, which Mr. Maher highlighted in yellow. The printed questions asked: "Was submitted aging substantially accurate?" Mitch reported: "No". The next question asked: "If not, explain (Attach schedule of corrections." Mitch answered:

Aging includes Rudco Ind. Invoice dated 5/82—20.0m Never Shipped—Inventory Goods—should be Debit Memo Billing— See Attached (C).

In an attached memorandum C, Mitch explained as follows:

Rudco Industries—

Testing on open invoices Revealed Payments in Amounts other than original invoice Amounts. In checking further with Bill Hamlin and through Customer file duplicate invoices were found.

In most cases we would get First invoice for $10,000 or $20,000—and signed B/L. These goods were kept in warehouse and shipped out over next 30-60 days. Rudco would pay duplicate invoices and BFM would apply to 1st invoice. Duplicate invoices were not sent to EFHCC. [The plaintiff] At present 20,000 of the 40,000 invoiced 5/81 has not been shipped.

(Exhibit L).

15. This single instance of a discrepancy in BFM's assigned receivables discovered in June of 1982, forms the basis for the debtors' contention that the plaintiff did not rely upon any representations that BFM's assigned receivables were valid and bona fide outright sales of merchandise sold and delivered. This so-called "red flag", related to one account debtor, Rudco Industries. Plaintiff's loan officer, Thomas F. Maher, to whom the report was addressed, testified that BFM was contacted

by telephone, and when advised of these facts, responded that it was a mistake and, that the receivables had actually represented bill and hold merchandise and should not then have been assigned to the plaintiff. Mr. Maher testified that he advised BFM that this was not the way to handle bill and hold sales and that they claimed it was an honest mistake. The merchandise was ultimately delivered to Rudco Industries and payment was received.

16. Although the plaintiff was anxious to reduce BFM's delinquency with respect to the machinery and equipment loans owed to the plaintiff's NVR division by offsetting advances wired from funds due to BFM under assigned accounts receivable submitted by BFM to the plaintiff's commercial finance division, there was no evidence to support the debtor's contention that the plaintiff was only concerned with the amount and not the validity, of the assigned receivables and did not rely upon the debtors' representations that the assigned receivables were valid and reflected bona fide sales of merchandise sold and delivered by BFM.

17. Notwithstanding the plaintiff's routine audits, the confirmation inquiries sent to account debtors, and the field audits, the plaintiff discovered in September of 1982 that out of the advances which it made to BFM approximating $500,000, it had received assigned receivables which were bogus and did not represent bona fide invoices for merchandise sold and delivered by BFM to various named account debtors.

18. In July of 1982, the plaintiff advanced $267,000 to BFM. Its August 1982 advances to BFM amounted to $186,200. The plaintiff's advances to BFM in September amounted to $78,856, for a total during this period of $532,061. The plaintiff presently claims an unpaid balance after liquidating its collateral, in the sum of $167,000.

19. Richard Hamlin, an attorney who is the nephew of the debtor, William Hamlin, testified that he attended several meetings at the plaintiff's office and one meeting at his office in September of 1982. The purpose of the first meeting was to inform the plaintiff that BFM had serious financial difficulties and that BFM wanted to make the plaintiff as whole as possible. At the second meeting, the plaintiff informed BFM and its attorney that the plaintiff desired to take over BFM in order to liquidate the collateral. The third meeting was called in order to execute the documents required for the plaintiff's peaceful take over of BFM's business. The principals of BFM volunteered that they would make every effort to maximize the plaintiff's efforts to collect the assigned receivables.

20. At the first meeting at the plaintiff's office on or about September 20, 1982, which was attended by BFM's principals, Emanuel Salzman, William Hamlin, and their attorneys, debtor, William Hamlin, volunteered that some of BFM's receivables assigned to the plaintiff were not collectible. The plaintiff's loan officer, Thomas F. Maher, testified that the debtor, William Hamlin, handed him a list of receivables which Hamlin said were not collectible. Maher testified that Hamlin informed him that the paper contained a list of invoices for which the goods had not been produced or shipped. Maher further testified that when he asked Hamlin who had prepared the bogus invoices and supporting documents one of BFM's attorneys instructed Hamlin not to answer the question. Maher gave the original list of invoices that Hamlin had handed him to the plaintiff's attorneys for safekeeping. The plaintiff's attorneys could not locate the original, although a copy of the list was identified and marked. The total of the receivables on this list amounted to $147,-836.92.

21. Richard Hamlin, the nephew of the debtor, William Hamlin, attended the September 20, 1982 meeting because his firm then represented BFM. When called to testify in this case he admitted that William Hamlin handed over to the plaintiff a list of receivables owed to BFM. He further confirmed that the principals of BFM said that not all of the receivables on the list were not collectible. When the plaintiff's loan officer asked which receivables

on the list were not collectible, Mr. Stephen Fine, another attorney for BFM, stated that they would not discuss that subject any further. Richard Hamlin testified that he did not hear the debtor, William Hamlin, say that the list contained invoices for which work had not been done. He only heard William Hamlin say that some of the invoices were not collectible.

22. Stephen Fine, who attended the September 20, 1982 meeting at the plaintiff's office, was called to testify as to the events at that meeting. He said that he saw a document which was represented to be a list of BFM accounts receivable with respect to which the BFM principals were supposed to have said that not all the goods were shipped to the named accounts. Fine testified that the plaintiff's loan officer, Thomas Maher, asked which invoices reflected items that had not been shipped by BFM. Fine testified that he said "we will not answer that question." Maher replied that he had a right to know the answer. Fine testified that he said that "we will not have any more discussion about this point."

23. After the plaintiff learned from the principals of BFM at the September 20, 1982 meeting that it had extended credit to BFM in exchange for bogus invoices, the plaintiff proceeded to contact the account debtors named on the list which William Hamlin had handed to the plaintiff's loan officer. The plaintiff then discovered that some customers had never ordered the merchandise in question, other customers had cancelled their orders so that no merchandise was shipped and that some of the bills of lading purporting to reflect the receipt of shipments contained forged signatures.

24. The plaintiff introduced in evidence the following invoices listed in the Schedules of Collateral and Accounts signed by the debtor, William Hamlin, which were bogus and with respect to which no merchandise was shipped by BFM as warranted:

| Exhibit | Invoice No. | Amount | Schedule Exhibit |
|---|---|---|---|
| 51 | 13764 | $ 3,409.09 | 23 |
| 47 | 13711 | 4,057.91 | 21 |
| 48 | 13845 | 1,424.82 | 26 |
| 37 | 13703 | 19,850.00 | 20 |
| 39 | 13763 | 15,980.00 | 23 |
| 38 | 13710 | 2,000.00 | 21 |
| 60 | 13776 | 1,332.24 | 24 |
| 50 | 13560 | 3,794.28 | 29 |
| 43 | 13750 | 9,625.00 | 22 |
| | | TOTAL $61,473.34 | |

25. The following invoices listed in the Schedules of Collateral and Accounts signed by the debtor, Emanuel Salzman, which were bogus and with respect to which no merchandise was shipped by BFM as warranted were introduced by the plaintiff:

| Exhibit | Invoice No. | Amount | Schedule Exhibit |
|---|---|---|---|
| 55 | 13801 | $ 4,863.93 | 25 |
| 54 | 13637 | 6,822.46 | 28 |
| 63 | 13672 | 2,626.40 | 19 |
| 62 | 13558 | 10,718.92 | 29 |
| 41 | 13645 | 6,325.00 | 27 |
| 42 | 13644 | 2,398.00 | 27 |
| 59 | 13800 | 1,775.56 | 25 |
| | | TOTAL $35,530.27 | |

26. All of the above bogus invoices which were pledged by BFM in the total sum of $97,003.61 and listed on the Schedules of Collateral and Accounts signed by the debtors, Emanuel Salzman and William Hamlin, were itemized on the list that William Hamlin handed to Thomas Maher at the meeting on September 20, 1982. (Exhibit 31). This list also contained four additional items; three attributable to Rudco Industries and one involving Rand McNally. However, the plaintiff did not produce any Schedules of Collateral and Accounts or invoices reflecting these four items to show that they were assigned by BFM and that credit was advanced by the plaintiff for these orders.

27. The debtors had an opportunity to testify and deny the reasonable inferences arising out of the testimony and exhibits introduced by the plaintiff. They chose to remain silent and refused to testify on the ground that their answers might tend to incriminate them. This is their constitu-

tional right. However, since their knowledge and intentions are in issue, the court must resolve this point on the basis of the clear and convincing evidence in this case without the benefit of direct testimony from the debtors by way of a denial that might contradict the plaintiff's proof.

28. The evidence is clear and convincing that both debtors, Emanuel Salzman and William Hamlin, as the sole shareholders and operating officers of BFM submitted fictitious accounts receivable to the plaintiff for which merchandise had not been shipped or for which forged signatures on bills of lading had been submitted to show the receipt of deliveries that had not actually been made. It has also been established by clear and convincing evidence that the debtors knew or must have known that the invoices were false and that BFM had not shipped the invoiced merchandise to the named account debtors as warranted by the debtors in accordance with the terms of the assignment schedules which they both signed. The debtors were the only people in charge of BFM's business activities and were thoroughly familiar with all of its transactions and orders. They knew which jobs had been completed and they knew which invoices were fictitious and did not reflect outstanding receivables for merchandise that had been sold or delivered to customers. The customers of BFM dealt directly with either Emanuel Salzman or William Hamlin.

29. The fictitious invoices, totalling $97,003.61, constituted materially false statements in writing respecting BFM's financial condition on which the plaintiff reasonably relied for the purpose of extending credit to BFM. Even though the plaintiff was anxious to apply as many assigned receivables from BFM as it could obtain to reduce BFM's delinquency under its machinery and equipment account with the plaintiff's NVB division, there is no basis for concluding that the plaintiff was willing to accept bogus invoices and did not rely upon the debtors' representations that the invoices were bona fide and reflected outstanding amounts due for merchandise sold and delivered by BFM. The debtors' contend that it was unreasonable for the plaintiff to extend any credit to BFM after the plaintiff's field examiner detected in February of 1982 that there were duplicate invoices for bill and hold sales to Rudco Industries that were not shipped. The plaintiff's loan officer telephoned BFM and was informed that this was an honest mistake that was corrected. It does not help the debtors' case to assert that the plaintiff's own general procedures in the handling of the assigned invoices were not sufficiently careful so as to detect the debtors' fraud. The plaintiff was entitled to believe that they could rely upon the honesty of the debtors and that the debtors would not knowingly submit bogus invoices and forge the signatures of employees of their customers on bills of lading for merchandise never delivered by BFM.

30. Pursuant to the security agreement between the parties, the plaintiff agreed to advance funds to BFM up to eighty percent of the face value of the assigned accounts receivable. However, the face amount of each assigned account receivable served as collateral for all the credit which plaintiff extended to BFM, in addition to the specific advance attributed to an assigned invoice. Therefore, in light of the fact that the plaintiff has a deficiency claim against BFM in excess of $160,000, after liquidating the assigned collateral, it follows that the full face amount of all of the fictitious invoices, totalling $97,003.61, served as credit which the debtors obtained for BFM from the plaintiff. In other words, the plaintiff may have advanced funds up to eighty percent of the bogus receivables, but the remaining twenty percent of the receivables also served as collateral in the pool of BFM assets for the plaintiff's other advances and credit extensions which BFM obtained. Therefore, the total face amount of the fictitious invoices, namely $97,-003.61, represents a debt for an extension of credit by use of a materially false statement in writing, as proscribed under 11 U.S.C. § 523(a)(2)(B), for which the debtors are jointly and severally liable under their

written guarantees of payment with respect to BFM's obligations.

## DISCUSSION

### THE GUARANTEES

The debtors argue that they did not personally guarantee the obligations of their closely owned corporation BFM, to the plaintiff, Chrysler Capital Corp., or to the E.F. Hutton Credit Corporation. This point hinges on their position that they executed guarantees of BFM's obligations to IPCC and that corporation is not the plaintiff in this case. They maintain that their guarantees make no reference to advances and credit granted by IPCC's successors and assigns; only that IPCC may assign the guarantees to a successor with respect to the advances and credit made by IPCC. Therefore, the debtors assert that the loans and credit extended to BFM by E.F. Hutton Credit Corporation, or Chrysler Capital Corp., should not be covered by the guarantees that the debtors executed and delivered to IPCC. This argument might have been more persuasive if there had been evidence in this case that IPCC had ceased to exist and that a new entity succeeded to its business operations so that the management and business activities of the new entity were not the same as those of the former entity. However, the only evidence in this case with respect to the plaintiff's standing is that on May 15, 1981, IPCC changed its name to E.F. Hutton Credit Corporation by amending the certificate of incorporation filed with the Secretary of State of Delaware, the state where IPCC was incorporated. The name of the plaintiff corporation was again changed to Chrysler Capital Corporation on August 2, 1985, by a similar amendment of its certificate of incorporation. Thus, the evidence reflects that the plaintiff corporation is the same corporate entity entitled to the benefits and protection under the guarantees which the debtors signed and delivered on September 21, 1979. This is no proof that a substitution of lenders occurred which might preclude the plaintiff from relying upon the guarantees the debtors executed

and delivered to IPCC to cover the obligations of their corporation, BFM. Indeed, even if a merger had occurred, the surviving corporation could rely upon the efficacy of the guarantees for obligations that arose after the merger. *Metro Corrugated Containers, Inc. v. Owens-Illinois Glass Co.,* 185 F.Supp. 359, 361 (E.D.N.Y.1960). Similarly, the guarantees would continue to cover subsequent loans after a consolidation. *Chase Nat. Bank of City of New York v. Burg,* 32 F.Supp. 230, 232 (D.Minn. 1940). When the only evidence in the case reveals that the corporate entity entitled to the protection of the guarantees merely changed its corporate name, such entity is certainly entitled to rely upon those guarantees. *William Grain Company, Inc. v. Leval & Company, Inc.,* 277 F.2d 213, 216 (8th Cir.1960).

### THE LIQUIDATION OF THE COLLATERAL

The debtors contend that the collateral pledged by BFM was not liquidated in a commercially reasonable manner. This point was neither raised by the debtors in their pleading nor established at the trial. The debtors did not offer any evidence to contradict the plaintiff's deficiency claim. In any event, the debtors are liable under their guarantees for the full amount of advances and credit extensions made by the plaintiff to BFM. The advances against BFM's accounts receivable were liquidated by payments received from BFM's customers. The plaintiff established that a deficiency arose because it could not collect on fictitious invoices which the debtors submitted with respect to customers who had not ordered the merchandise invoiced, or had not received shipments of merchandise listed on forged bills of lading. It ill behooves the debtors to claim that the bogus invoices they submitted to the plaintiff as collateral for advances and credit were not liquidated in a reasonably commercial manner or that the plaintiff's collection efforts from BFM's customers were not as effective as the debtors had hoped.

## PLAINTIFF'S REASONABLE RELIANCE ON MATERIAL FALSE INVOICES

 The plaintiff has the burden under 11 U.S.C. § 523(a)(2)(B) of establishing by clear and convincing evidence that it advanced money and extended credit to BFM by use of a materially false statement in writing respecting BFM's financial condition on which the plaintiff reasonably relied and that the debtors caused such statement to be made with intent to deceive. *First National Bank of Red Bud v. Kimzey (In re Kimzey)*, 761 F.2d 421, 423 (7th Cir. 1985); *First National Bank of Lansing v. Kreps (In re Kreps)*, 700 F.2d 372, 375 (7th Cir.1983) (*en banc*); *Carini v. Matera, (In re Matera)*, 592 F.2d 378 (7th Cir.1979); *Public Finance Corporation of Redlands v. Taylor (In re Taylor)*, 514 F.2d 1370 (9th Cir.1975); *National Bank of North America v. Newmark (In re Newmark)*, 20 B.R. 842, 853 (Bankr.E.D.N.Y.1982); *In re Milbank*, 1 B.R. 150, 154 (Bankr.S.D.N.Y. 1979). Once the plaintiff establishes a *prima facie* case of fraud, the burden of going forward with the evidence shifted to the debtors. *Carini v. Matera, (In re Matera)*, 592 F.2d at 380–381; *Public Finance Corporation of Redlands v. Taylor (In re Taylor)*, 514 F.2d at 1373. It is also well-established that a bankruptcy court must recognize that the relief afforded in bankruptcy cases was intended to permit an honest debtor to obtain a fresh start, so that objections to a discharge must be construed strictly against the objectant and liberally in favor of the debtors. *Bank of Pennsylvania v. Adlman (In re Adlman)*, 541 F.2d 999 (2d Cir.1976); *In re Kokoszka*, 479 F.2d 990, 966 (2d Cir.1973); *aff'd sub nom Kokoszka v. Belford*, 417 U.S. 642, 94 S.Ct. 2431, 41 L.Ed.2d 374, *reh. denied* 419 U.S. 886, 95 S.Ct. 160, 42 L.Ed.2d 131 (1974); *In re Tabibian*, 289 F.2d 793, 795 (2d Cir.1961). However, this general principle applies to protect debtors only in those cases where there is no intent to violate the bankruptcy laws and the debtors acted honestly. *Northern Trust Company v. Garman (In re Garman)*, 643 F.2d 1252, 1257 (7th Cir.1980) (*en banc*); *Standard Chartered Bank, PLC v. Klepach (In re Bonanza Import & Export, Inc.)*, 43 B.R. 570, 575 (Bankr.S.D.Fla. 1984).

There is no question that an assigned fraudulent invoice is a materially false statement in writing respecting the financial condition of the assignor. *First National Bank of Red Bud v. Kimzey (In re Kimzey)*, 761 F.2d at 424; *In re Butler*, 425 F.2d 47 (3d Cir.1970); *Albinak v. Kuhn, (In re Manufacturers Trading Corporation)*, 149 F.2d 108 (6th Cir.1945); *In re Lurie*, 385 F.Supp. 784, 793 (E.D.N.Y. 1974); *In re Simard*, 254 F.Supp. 609, 613 (W.D.Ark.1966); *In re Bernfeld*, 247 F.Supp. 89, 95 (E.D.N.Y.1965). The debtors contend that the plaintiff did not reasonably rely upon the debtors' written warranties set forth at the bottom of each Schedule of Collateral and Accounts which the debtors signed when pledging invoices. These warranties stated that the schedules set forth undisputed choses in action then owing to BFM for bona fide outright sales and deliveries of goods or for work, labor and services actually rendered and accepted by BFM's account debtors. The debtors attempt to negate the plaintiff's proof of reasonable reliance on the debtors' warranties by showing: (a) The plaintiff extended credit to BFM after learning in June of 1982 that the debtors misrepresented the validity of certain sales to Rudco Industries because duplicate invoices were found; (b) The plaintiff's employees disregarded its own policy standards and accepted invoices without evidence that the merchandise covered by the invoices had been received by BFM's customers because the plaintiff was anxious to apply the assigned invoices in reduction of BFM's deficiency under the machinery and equipment obligations owed to the plaintiff's NVB division.

 Manifestly, when a creditor turns its back on an obvious "red flag" and continues to make advances and extend credit to a debtor after the creditor discovers that the debtor obtained money or property from the creditor by means of fraudulent representations, such creditor cannot be

heard to say thereafter that subsequent credit was extended in reasonable reliance upon the past misrepresentations. *Bank of Louisville v. Perez (In re Perez)*, 52 B.R. 824 (Bankr.W.D.Ky.1985); *National Bank of North America v. Newmark (In re Newmark)*, 20 B.R. at 861. The debtors contend that when plaintiff's field examiner discovered duplicate invoices from Rudco Industries in June of 1982 which revealed that merchandise had not been shipped by BFM to Rudco, the plaintiff should not have extended additional credit to BFM thereafter during the next three months and up to the September 20, 1982 meeting when the debtor, William Hamlin, admitted to the plaintiff's representatives that there were uncollectible receivables which BFM had assigned to the plaintiff during that period in exchange for credit advances. Thus, the debtors argue that plaintiff's field examiner's report in June of 1982 establishes, beyond question, that the plaintiff uncovered the very device which it now asserts as the basis for nondischargeability. However, the evidence establishes that this so-called "red flag" incident was explained to the plaintiff as an honest mistake that would not happen again. The plaintiff accepted BFM's explanation and had no reason to suspect that BFM would thereafter submit fictitious invoices, some of which were further disguised by accompanying forged bills of lading. The plaintiff had dealt with the debtors, as principals of BFM, for over three years and had no grounds to question their honesty or integrity. The June incident did not involve forged bills of lading, and the invoiced merchandise was ultimately delivered and payment was made. There was no reason why the plaintiff should thereafter suspect that the debtors would submit bogus invoices and forged bills of lading.

Furthermore, although a creditor is not entitled to rely upon an obviously false representation of the debtor, this does not require him or her to view each representation with incredulity requiring verification.

*Northern Trust Company v. Garman (In re Garman)*, 643 F.2d at 1259–1260. As this court stated:

[The creditor] should not be faulted for accepting net worth figures from someone who appeared to be an honest investor who had, for two previous years, maintained a checking account with the bank.

*Lincoln First Bank N.A. v. Vairo (In re Vairo)*, 40 B.R. 776, 781 (Bankr.S.D.N.Y. 1984). Prior business dealings between the parties may cause a creditor to believe that the debtor's representations are reliable and honest. *Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1166–67 (6th Cir.1985). In any event, it is sufficient if the creditor's reliance on the debtor's representations was a contributing factor in causing the loss even though such reliance was partial and not solely motivated by the debtor's false representations. *First National Bank of Colorado Springs v. Clancy (In re Clancy)*, 279 F.Supp. 820, 822–823 (D.Colo.1968), *aff'd*, 408 F.2d 899 (10th Cir.), *cert. denied*, 396 U.S. 958, 90 S.Ct. 430, 24 L.Ed.2d 422 (1969); *First National Bank of Boston v. Coughlin (In re Coughlin)*, 27 B.R. 632, 637 (Bankr. 1st Cir.1983); *Lincoln First Bank N.A. v. Vairo (In re Vairo)*, 40 B.R. at 781.

Hence, the "red flag" argument is a "red herring." Similarly there is nothing in the record to warrant a finding that the plaintiff's employees failed to reject invoices that were not accompanied by bills of lading because they were anxious to apply as many invoices as they could in reduction of BFM's delinquency with respect to the machinery and equipment account with the plaintiff's NVB division. This position is refuted by the fact that the forged bills of lading that BFM did submit helped to further obfuscate the fraudulent scheme. The debtors should not now be heard to say that their dishonesty could have been detected if the plaintiff's employees were not as gullible and had followed every rule printed in the plaintiff's policy manual. Additionally, there is no evidence to support the debtors' argument that the plaintiff was not concerned with the validity of

BFM's receivables and that the plaintiff simply wanted to reduce BFM's unsecured obligation owed to the plaintiff's NVB division. It would serve no purpose for the plaintiff to apply bogus receivables in reduction of this account. Whatever motives the plaintiff had with respect to this account, it is absurd to conclude that the plaintiff did not rely upon the validity of the assigned receivables and the debtors' representations that the receivables reflected obligations for merchandise actually sold and delivered to its customers when the plaintiff applied them in reduction of BFM's machinery and equipment loan delinquencies. The plaintiff has established that further credit would not have been extended to BFM if the plaintiff had known that the assigned receivables were fictitious and that they did not represent bona fide obligations for goods sold and delivered by BFM, as expressly represented by the debtors when they signed the assignment schedules.

### INTENT TO DECEIVE

■ A debtor who is not granted immunity under 11 U.S.C. § 344 is free to claim the privilege against self-incrimination, and may refuse to testify and, nevertheless, retain a right to claim a discharge in bankruptcy. *Turner v. Wlodarski (In re Minton Group, Inc.)*, 43 B.R. 705, 709 (Bankr. S.D.N.Y.1984). In claiming their privilege against self-incrimination, the debtors in their answers neither admitted nor denied the allegations in the complaint that they assigned fictitious invoices to the plaintiff in exchange for loans and credit given to their corporation, BFM, with intent to deceive the plaintiff. Pursuant to Rule 8(d) Fed.R.Civ.P., made applicable to adversary proceedings in bankruptcy cases by Bankruptcy Rule 7008(a), averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied. Thus, each debtor neither admitted nor denied the allegation that "he made or participated in making representations that he knew to be false ..." and that the plaintiff "relied on such false representations when

[the plaintiff] had advanced substantial sums of money to BFM."

■ In a strikingly similar bankruptcy case involving a turnover order directed to controlling officers of a debtor corporation who invoked their privilege against self-incrimination and refused to answer the pleading that they possessed funds of the bankruptcy estate, the Seventh Circuit Court of Appeals ruled:

We are aware of Harris' and Silverstein's heavy reliance on their privilege against self-incrimination. We do not contest their privilege to rely on it but we do not believe they are entitled to use it as a sword permitting them to circumvent Rule 8(d) F.R.Civ.P., and thereby conceal the whereabouts of money belonging to the trustee in bankruptcy. As was so aptly stated in the recent case of *Sahn v. Pagano*, 302 F.2d 629 (2nd Cir. 1962):

"Pagano was free to avail himself of the privilege against self-incrimination but—whether or not an inference could be drawn from his doing so in a proceeding of this sort, see 8 Wigmore, Evidence (McNaughton rev. 1961), § 2272, at p. 439 & fn. 14—his claim that testimony would incriminate him cannot be transformed into a plausible assertion of innocence in the acquisition of the monies or an adequate denial of continued possession of them * * *." (citing cases.) (at page 632).

*Silverstein v. Phelps (In re Sterling-Harris Ford, Inc.)*, 315 F.2d 277, 279 (7th Cir. 1963), *cert. denied sub nom. Silverstein v. Phelps*, 375 U.S. 814, 84 S.Ct. 46, 11 L.Ed.2d 50 (1963) (footnote omitted); *see Sahn v. Pagano*, 302 F.2d 629 (2d Cir. 1962), *cert. denied* 371 U.S. 819, 83 S.Ct. 34, 9 L.Ed.2d 59 (1962). However, the plaintiff did not seek an order overruling the debtors' claim of privilege and compelling them to answer the complaint. If the privilege had been overruled, the debtors would have had to submit their answers on the merits of the allegations in the complaint. The debtors' refusal to answer on

the merits because their claim of privilege should not be treated as a judicial admission of the charges in the complaint. *See Rogers v. Webster,* 776 F.2d 607, 611–612 (6th Cir.1985); *National Acceptance Co. of America v. Bathalter,* 705 F.2d 924, 932 (7th Cir.1983) ("We conclude that defendant's claim of privilege should not have been deemed an admission, and the plaintiff should have been put to its proof, either by way of evidentiary support for a motion for summary judgment or at trial.") In *Chicago Title Insurance Company v. Goldberg (In re Goldberg),* 12 B.R. 180, 182 (Bankr.D.N.J.1981), the Bankruptcy Court did treat a debtor's refusal to answer a nondischargeability complaint bottomed on 11 U.S.C. § 523(a)(4) as a judicial admission. Nonetheless, the court also determined allegations of fraud on the merits.

The evidence in this case clearly and convincingly reflects the fact that the debtors were sole shareholders and controlling officers of BFM. They had direct dealings with BFM's customers and were thoroughly familiar with BFM's business operations. The debtor, Emanuel Salzman, was in charge of sales and pricing, while the debtor, William Hamlin, was in charge of the printing shop and in total control over production. However, William Hamlin also dealt directly with customers of BFM. Indeed, Mr. De Rosa, the officer of Rudco Industries, testified that he dealt mainly with Mr. Hamlin. Accordingly, both debtors were thoroughly familiar with the extent of BFM's sales and production activities. Both debtors knew, or should have known, which invoices reflected bona fide sales and which did not. Moreover, both debtors knew which invoices were assigned to the plaintiff, as reflected by their signatures on the assignment schedules. Even if both debtors had testified that they did not know that the total of $97,003.61 in receivables, for which they signed assignment schedules, did not reflect bona fide customer obligations for merchandise actually delivered by BFM, such conduct would amount to reckless indifference to the true facts. When a principal of a corporation signs false documents without examining them and either knows or should have known of the fraud, the requisite intent to defraud may be inferred from such reckless disregard of the accuracy of the facts, because had the principal paid minimal attention, he would have been alerted to the fraud. *Driggs v. Black (In re Black),* 787 F.2d 503, 506 (10th Cir.1986); *Walker v. Citizens State Bank of Maryville, Missouri (In re Walker),* 726 F.2d 452, 454 (8th Cir.1984) *(per curiam), on remand,* 53 B.R. 174 (Bankr.W.D.Mo.1985); *In re Lovich,* 117 F.2d 612, 614 (2d Cir.1941); *First National Bank of Boston v. Coughlin (In re Coughlin),* 27 B.R. at 636.

Significantly, the issue as to the debtors' intent to defraud can best be negated by the debtors themselves, since their state of mind is in issue. Although they may invoke their privilege against self-incrimination and may refuse to testify as to their intentions, they may not transform such refusal to testify into an assertion of innocence. *Sahn v. Pagano,* 302 F.2d at 632. Moreover, when a debtor refuses to testify in response to probative evidence offered against him in support of a complaint to determine dischargeability of a creditor's claim, it is proper for the Bankruptcy Court to draw adverse inferences from his invocation against self-incrimination. *International Harvester Credit Corporation v. Todd (In re Todd),* 47 B.R. 18, 21 (Bankr.N.D.Miss.1984) (An indebtedness resulting from debtor's fraudulent assignment of retail contracts was not discharged); *In re Crabtree,* 39 B.R. 718, 725–726 (Bankr.E.D.Tenn.1984) (A debtor's invocation of the privilege against incrimination shifted the burden of producing evidence to the debtor). Not only has the plaintiff established a *prima facie* case that the debtors submitted fictitious invoices which they represented to be bona fide, so that the burden of producing evidence shifted to the debtors to show that they did not intend to deceive the plaintiff, *Carini v. Matera, (In re Matera),* 592 F.2d at 380–381; *Public Finance Corporation of Redlands v. Taylor (In re Taylor),* 514 F.2d at 1373; *In re Crabtree,* 39 B.R. at

725–726, but the plaintiff has also established by clear and convincing evidence that the debtors' actions were intended to, and did, deceive the plaintiff.

### ·CONCLUSIONS OF LAW·

1. This court has jurisdiction of the subject matter and the persons in this case in accordance with 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I).

2. The plaintiff, Chrysler Capital Corp., has established by clear and convincing evidence that it advanced money and extended credit to BFM in excess of $97,003.61, for which the debtors, Emanuel Salzman and William Hamlin, are jointly and severally liable to the plaintiff under their written guarantees of payment which they each signed and delivered to the plaintiff when it was formerly known as International Paper Credit Corporation. On May 15, 1981, International Paper Credit Corporation formally changed its corporate name to E.F. Hutton Credit Corporation which, in turn, changed its name on August 2, 1985, to Chrysler Capital Corp.

3. The plaintiff has established by clear and convincing evidence that its claim against the debtors, Emanuel Salzman and William Hamlin, under their written guarantees of payment in favor of the plaintiff with respect to the obligations of BFM, includes a claim for $97,300.61, for money, or an extension, renewal or refinancing of credit which the debtors obtained from the plaintiff for BFM by their assignment of fictitious invoices and accounts receivable of BFM, which the debtors represented were bona fide choses in action for the sale and delivery of merchandise of BFM to its customers.

4. The debtors' obligations to the plaintiff in the sum of $97,003.61 was shown by clear and convincing evidence to constitute a debt for money, or an extension, renewal, or refinancing of credit, which was obtained from the plaintiff by use of statements in writing that were materially false, respecting the financial condition of the debtors' corporation, BFM, on which the plaintiff reasonably relied, and that the debtors caused such statements in writing to be made and assigned to the plaintiff with intent to deceive the plaintiff and which, in fact, did deceive the plaintiff to its detriment, within the meaning of 11 U.S.C. § 523(a)(2)(B).

5. The plaintiff's claim against the debtors, for which they are jointly and severally liable to the plaintiff to the extent of $97,003.61, is nondischargeable in accordance with the provisions of 11 U.S.C. § 523(a)(2)(B).

SETTLE ORDERS on notice in each case.