**In re Martin REISMAN, Debtor.**

**FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver for First New York Bank for Business, Plaintiff,**

**v.**

**Martin REISMAN, Defendant.**

**Bankruptcy No. 92 B 20128.**
**Adv. No. 92–5177–A.**

United States Bankruptcy Court, S.D. New York.

Jan. 6, 1993.

See also 139 B.R. 797.

Marc Stuart Goldberg & Associates, P.C. (Receiver for First New York Bank for Business), New York City, for F.D.I.C.

Cascone, Cole & Savage, New York City, for Martin Reisman.

## DECISION ON COMPLAINT FOR AN ORDER DECLARING DEBT DUE FEDERAL DEPOSIT INSURANCE COMPANY NONDISCHARGEABLE

HOWARD SCHWARTZBERG,
Bankruptcy Judge.

The Federal Deposit Insurance Corporation ("FDIC"), as successor in interest to the First New York Bank for Business ("FNYBB"), has objected to the dischargeability of its claim against the debtor under 11 U.S.C. § 523(a)(2)(B). The FDIC alleges that Martin Reisman ("Reisman"), the debtor in this Chapter 11 proceeding, intentionally submitted materially false financial statements to FNYBB to induce the bank to grant certain corporate loans which he personally guaranteed. The FDIC also asserts that FNYBB relied on the false statements when it made the loans in question.

The debtor resists the FDIC's objection and argues that its claim is dischargeable and that 11 U.S.C. § 523(a)(2)(B) is inapplicable for several reasons. First, the debtor asserts that he did not intend to deceive FNYBB with the statements. He claims that his accountant prepared the statements and submitted them directly to the bank. The debtor maintains that he neither reviewed the statements nor furnished them to the bank. The debtor also contends that the statements are not materially false. Although he acknowledges that certain contingent liabilities and joint ownership interests are not scheduled on his financial statements, the debtor argues that the errors are not significant. Finally, the debtor asserts that FNYBB did not reasonably rely on the financial statements when it extended the corporate loans. Rather, he claims that the bank granted the loans based upon the strong economic position of the borrower and the prospect of future business dealings with the company.

## FINDINGS OF FACT

1. On January 21, 1992, the debtor filed a voluntary petition for reorganizational relief under Chapter 11 of the Bankruptcy Code and has continued as a debtor-in-possession in accordance with 11 U.S.C. §§ 1107 and 1108.

2. FNYBB is a banking corporation with a principal place of business in New York. FNYBB filed the instant adversary proceeding on June 2, 1992. Subsequently, the FDIC became receiver of FNYBB. On December 8, 1992, this court "so ordered" a stipulation substituting the FDIC for FNYBB as the party in interest in this proceeding.

3. The debtor is the sole shareholder and president of Statewide Trading Corporation ("Statewide"), a distributor of clothing. Statewide is a New York corporation with headquarters in Chester, New York and is the successor to Statewide Trading, Inc., a Delaware corporation.

4. In August of 1987, Statewide Trading, Inc. entered into a security agreement with The First Women's Bank ("FWB"), predecessor to FNYBB. Pursuant to this agreement, FWB extended an unlimited line of credit to Statewide Trading, Inc. The debtor, as president of the corporation,

executed a promissory note payable from Statewide Trading, Inc. to FWB. As a condition to the line of credit, the debtor personally guaranteed Statewide Trading, Inc.'s obligations to FWB. From time to time during 1988, FWB advanced funds to Statewide Trading, Inc. in various amounts subject to an approved line of credit.[1]

5. The debtor argues that the FDIC, the plaintiff in this action, has failed to establish that loans were ever made to Statewide Trading, Inc. and Statewide. However, this argument is unpersuasive because the loans are documented by Offering Tickets *Trial Exhibit* 14. Whenever a loan was made, FWB would generate an Offering Ticket which identified the borrower, the guarantor, and the amount and terms of the loan. The loans to Statewide are further substantiated by the fact that a state court judgment was entered against the debtor, as guarantor of the loans, for the unpaid balance.

6. The original security agreement was re-documented in March of 1990 to reflect the re-incorporation of Statewide Trading, Inc., the Delaware corporation, to Statewide, the New York corporation. Because FWB had already merged with FNYBB, FNYBB was the party in interest to the newly executed agreement.[2] The agreements are substantially similar.

7. Pursuant to the newly executed security agreement, FNYBB granted a $2 million line of credit to Statewide. The debtor, as president and secretary of Statewide, executed a promissory note for $2 million payable from the corporation to FNYBB. The debtor also personally guaranteed Statewide's obligations to FNYBB. Following the re-documentation of the security agreement, FNYBB made periodic short term loans to Statewide. Like the earlier

loans, these advances were documented by Offering Tickets.

8. As guarantor of Statewide's indebtedness, the debtor was required to submit personal financial statements to FNYBB as a condition to the loans. Both the original and the subsequent security agreement provide that the loan will be in default if a guarantor fails to furnish the bank with financial information on demand. *Trial Exhibits* 1 & 6, at ¶ 10. William Kaeblein, formerly the vice-president of FNYBB responsible for overseeing the Statewide loans, testified that the debtor was directed to submit personal financial statements to the bank. In a letter dated August 27, 1990 from Kaeblein to Mayer Rispler ("Rispler"), Statewide's accountant and the debtor's personal accountant,[3] Kaeblein noted that, pursuant to an earlier conversation with Rispler, he was awaiting the debtor's personal financial statement in connection with the Statewide loan. *Trial Exhibit* B. Rispler signed a copy of the letter in acknowledgement of its receipt. Four Line Sheets, informal evaluations of loans drafted by representatives of FNYBB periodically from 1988 through 1991, list the debtor as guarantor of the Statewide loans and indicate that his personal financial statement was required by the bank. *Trial Exhibits* 19–22.

9. Between 1988 and 1991, four statements reflecting the debtor's financial position were submitted to FNYBB. Each statement was prepared by Rispler and purports to set forth the debtor's assets and liabilities. Rispler sent the financial statements directly to FNYBB accompanied by a signed cover letter which states that the documents were prepared in accordance with established accounting standards. Rispler claimed that the debtor provided him with the facts contained in the financial statements. However, he ex-

---

1. The line of credit was initially set at $1.5 million. In the early part of 1988, it was raised to $1.8 million. During the latter part of 1988, the line of credit was increased to $2 million.

2. It is unclear from the evidence presented at the trial when FWB merged with FNYBB. However, the Offering Tickets suggest that the merger took place in June of 1989. *See Trial Exhibit* 14. On the Offering Tickets executed at

this time, FNYBB replaces FWB in all references made to the lending institution.

3. During a deposition which was read into the record, Rispler testified that he prepared the debtor's tax returns. Rispler prepared the debtor's 1989 Individual Income Tax Return *Trial Exhibit* 42.

plained that he did not advise the debtor how the information would be used.

10. The first statement was submitted to FNYBB on August 3, 1988 and indicates that debtor's net worth as of June 30, 1988 was $6,107,000.00. The second statement was sent to the bank on July 31, 1989 and indicates debtor's net worth as of June 30, 1989 was $6,952,000.00. The third statement was sent to the bank on September 6, 1990 and indicates that the debtor's net worth as of June 30, 1990 was $6,225,000.00. The fourth statement was sent to the bank on July 2, 1991 and indicates that the debtor's net worth as of May 31, 1991 was $2,747,000.00.

11. The statements were substantially false. They failed to reflect that the debtor owned two parcels of real property located in Chester, New York jointly with his brother, Chaim Reisman. They falsely indicated that the debtor owned these properties free and clear of any outstanding indebtedness when in fact the properties were subject to a $400,000.00 mortgage. They falsely stated that the debtor had direct ownership interest in three parcels of real property located in Salem, New Jersey, Wilkes–Barre, Pennsylvania and Brooklyn, New York when in fact the debtor held stock in various corporations which owned the properties. The 1990 and 1991 statements did not reveal that the debtor had previously pledged his stock in the corporation that owned the Wilkes–Barre property. The statements omitted a $250,000.00 personal loan that the debtor received from the Bank of New York in December, 1988 and failed to note that the debtor personally guaranteed a $350,000.00 mortgage on the Brooklyn property.

12. The debtor's personal guaranty was a factor supporting the bank's decision to extend the Statewide loans. All of the Offering Tickets noted that the debtor personally guaranteed Statewide's debts. At various times from 1988 through 1991, the debtor was listed as the guarantor of the Statewide loans on the bank's Line Sheets, which are informal evaluations of the credit arrangement. The three most recent Line Sheets also report the debtor's outside net worth, which was his net worth less the Statewide liability. The calculation of the debtor's outside net worth demonstrates that representatives from the bank not only reviewed the debtor's financial statements but also analyzed them.

13. Kaeblein, in a memorandum dated June 19, 1989 concerning the Statewide account, stated that Vincent Puleo, an auditor with the bank, recommended continued financing. As justification for this decision, Mr. Puleo cited Statewide's strong sales volume and efficient management and noted that

the following must also be considered: 1) the client was maintaining six figure DDA balances with FNY; 2) we have a lien on all assets of the company; 3) the principal, Martin Reisman, has a net worth over $7MM on whom we have an unlimited guarantee.

*Trial Exhibit* 16.

14. A memorandum dated January 8, 1990 written by Kaeblein in connection with the Statewide loans provides, in relevant part, as follows:

The personal guarantee of Martin Reisman also strengthens this credit. Mr. Reisman's most recent Personal Financial Statement (dated 6/30/89) reveals an outside net worth of $5,718M after reducing N.W. by his equity interest in Statewide ($1.2MM) and by a provision for estimated income taxes on gain of sale of assets of $1.8MM. He shows equity in real estate investments of $6,187M represented by 11 properties, 7 of which he is 100% owner. . . .

*Trial Exhibit* 15.

15. Marc Weiss ("Weiss"), a loan officer with FNYBB, in correspondence to the members of FNYBB's Executive Credit Committee, wrote that the debtor's personal guaranty of Statewide's debts is a consideration for extending the corporate loans. *Trial Exhibit* 17.

16. Kaeblein testified that FNYBB looked to the debtor's personal financial statements to support the strength of his personal guaranty. He stated that if debtor's true financial position had been revealed, the bank's decision to grant the

Statewide loans would have been adversely affected. Kaeblein also testified that if he had known that the debtor did not own real property directly, but instead through various corporations, he would have requested financial statements from those corporations.

17. In July of 1991, Statewide filed a petition for relief under Chapter 11 of the Bankruptcy Code. The filing of Statewide's petition constituted a default of the security agreement. Accordingly, FNYBB commenced an action against the debtor upon his guaranty. On January 3, 1992, judgment was rendered against the debtor and in favor of FNYBB in the sum of $1,427,861.77. Shortly thereafter, the debtor filed his Chapter 11 petition.

18. The debtor argues that he never intended to deceive FNYBB. He testified that he never caused the financial statements to be sent to FNYBB. Rather, the debtor claims that Kaeblein received the statements directly from Rispler, his accountant. The debtor contends that he did not review the statements and that he was unaware that Rispler sent them to the bank.

19. Kaeblein testified that he discussed the statements with the debtor. Specifically, Kaeblein said that he asked the debtor about outstanding mortgages on several parcels of real property. Livia Yanowicz ("Yanowicz"), a former employee of FNYBB, testified that she reviewed the debtor's financial statements and spoke to him about the 1991 statement. Thus, even if the debtor did not know that Rispler submitted his financial statements to the bank, he became aware of the statements from his conversations with Kaeblein and Yanowicz.

20. The debtor also argues that the financial statements were not materially false. He claims that the statements did not disclose that he owned property in Chester, New York jointly with his brother Chaim Reisman because his brother had agreed to turn over the property to him. However, he testified that there is no written agreement evidencing this arrangement. The debtor asserts that the fact that the statements show that certain property is owned by the debtor directly when, in fact, it is owned by various corporations in which the debtor has an interest does not make them materially false because the debtor's rights in the property are the same under both corporate and individual forms of ownership. However, Kaeblein testified that he would have attributed less value to the parcels of property in question if he had known that the debtor did not own them directly but through a corporation.

21. In addition, the debtor argues that FNYBB and its predecessor, FWB, did not reasonably rely on the debtor's financial statements. In support of his position, the debtor points out that loans were made to Statewide Trading, Inc. before his financial statements were sent to the bank. The first financial statement was submitted to FWB on August 3, 1988. However, the security agreement had been executed in August 7, 1987. The first loan was made to Statewide on February 5, 1988. Approximately nine additional advances were made to Statewide Trading, Inc. before the 1988 financial statement was received by the bank. Clearly, FWB could not have relied on the debtor's financial statements when it extended these loans.

22. Kaeblein's testimony and the documentary evidence support the bank's position that it relied on the statements during the period from the latter part of 1988 through 1991. The evidence shows that about seventeen loans were advanced to Statewide Trading, Inc. from August 1988, when the debtor's first financial statement was received, through March of 1990, when the loan was re-documented to reflect Statewide Trading, Inc.'s reincorporation. During this period, according to the Offering Tickets, approximately $13 million was extended to Statewide Trading, Inc. in short term loans. After the security agreement was redocumented, approximately $2.5 million was advanced to Statewide. These amounts far exceed the $1.4 million judgment entered by the state court against the debtor on the loans. Because the amount Statewide borrowed exceeds

the judgment against the debtor, the entire amount of the judgment may be found to be nondischargeable even though the bank did not rely on the debtor's false financial statements until late 1988, after the initial loan was granted.

23. The debtor finally argues that, even if FNYBB actually relied on the financial statements, that reliance was not reasonable. In support of this argument, the debtor points out that Kaeblein never conducted a *lis pendens* search on any of the debtor's real property. The debtor also asserts that Kaeblein should have conducted an investigation as to whether the debtor personally guaranteed other liabilities because the Statewide obligation was omitted from the financial statements. The debtor contends that the omission of the Statewide debt from the financial statements should have alerted Kaeblein that other contingent liabilities may not have been scheduled.

24. Kaeblein testified that, after examining the financial statements and discussing them with the debtor, he did not think that they needed to be investigated any further. He stated that he had absolutely no reason to believe that the information contained in statements was incorrect. Kaeblein visited the three parcels of property located in Chester, New York which were scheduled as assets on the debtor's financial statements. He obtained financial statements of corporations in which the debtor had a significant equity interest.

### DISCUSSION

■ The Bankruptcy Code provides that a debt is nondischargeable if money, property, services, or credit were obtained by:

(B) use of a statement in writing—

 (i) that is materially false;

 (ii) respecting the debtor's or an insider's financial condition;

 (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

 (iv) that the debtor caused to be made or published with intent to deceive;

11 U.S.C. § 523(a)(2)(B). The FDIC, the plaintiff in this proceeding, has the burden of proving each of the elements in this statute by the preponderance of evidence. *Grogan v. Garner*, 498 U.S. 279, ——, 111 S.Ct. 654, 660, 112 L.Ed.2d 755 (1991). The FDIC has established all of the elements delineated by the statute. Therefore, its claim against the debtor is nondischargeable.

■ The debtor, through his accountant, submitted to FNYBB statements in writing respecting his financial condition which are materially false. A materially false statement under 11 U.S.C. § 523(a)(2)(B) is one which is substantially inaccurate. *In re Frugh*, 133 B.R. 870, 874 (Bankr.N.D. Ohio 1991); *In re Galizia*, 108 B.R. 63, 67 (Bankr.W.D.Pa.1989); *In re Rodriguez*, 29 B.R. 537, 539 (Bankr. E.D.N.Y.1983). Whether or not an inaccuracy is substantial is a matter of fact. *Id.*

■ In the instant case, the debtor's financial statements are substantially inaccurate for the following reasons: (1) They misrepresent that the debtor is the sole owner of two parcels of real estate when in fact he owns the property jointly with his brother; *In re Rickey*, 8 B.R. 860, 863 (Bankr.M.D.Fla.1981); (2) They incorrectly list the debtor as the direct owner of three parcels of real property when the property is actually owned by various corporations in which the debtor has an equity interest; (3) They do not reveal that the debtor has pledged his stock in a corporation which owns property which he scheduled as one of his assets; *Jordan v. Southeast Nat'l Bank (In re Jordan)*, 927 F.2d 221, 224 (5th Cir.1991); *In re Biedenharn*, 30 B.R. 342, 345 (Bankr.W.D.La.1983); (4) They omit significant liabilities of the debtor, including a $250,000.00 personal loan. *In re Main*, 133 B.R. 746, 751 (Bankr.W.D.Pa. 1991); *Galizia*, 108 B.R. at 67.

■ The debtor caused the false statements to be submitted with the intent to deceive the bank even though the statements in issue were prepared and furnished to FNYBB by Rispler, the debtor's accountant. Direct proof of the debtor's intent to deceive is not required for a debt

to be nondischargeable under 11 U.S.C. § 523(a)(2)(B). Rather, intent to deceive may be inferred from the surrounding circumstances. *In re Masegian,* 134 B.R. 402, 406 (Bankr.E.D.CA.1991). Reckless indifference or a disregard for the accuracy of a financial statement is sufficient to prove intent to deceive. *In re Magnusson,* 14 B.R. 662, 669 (Bankr.N.D.N.Y.1981). The plaintiff has established from the documents and testimony that the debtor intended to deceive the bank as to his personal financial condition.

■ The evidence presented at the hearing shows that the debtor knew that his personal financial statement was required as a condition to the Statewide loan, that he was aware that his accountant submitted the statements to the bank, and that he recklessly disregarded their accuracy. The security agreements, which the debtor signed, put him on notice that the lending bank could require him to submit a financial statement as a condition to the loan. Kaeblein's testimony that the debtor was indeed directed to submit his financial statements to the bank was credible. This testimony is substantiated by the letter he wrote to Rispler requesting the statements and by the Line Sheets which indicate that the debtor's personal financial statements were required in connection with the Statewide loans. Rispler stated that the debtor supplied him with the information which he used on the statements. Even though the debtor was aware that his personal financial statements were sent to the bank, he did not review them or inquire as to their accuracy.

The debtor's assertion that he was not aware that his financial statements were submitted to the bank is implausible for several reasons. There is sufficient credible evidence sustaining the bank's position that the debtor knew about the statements. Furthermore, it is utterly inconceivable that Rispler, the debtor's personal accountant, did not inform him that he was submitting his financial statements to the bank, particularly when the debtor had supplied Rispler with the information upon which the statements are based. Finally,

Kaeblein and Yancowicz, another employee of FNYBB, testified that they discussed the statements with the debtor on several occasions. Obviously, the debtor learned from these conversations that Rispler had sent his financial statements to the bank.

■ Even if this court were to accept the debtor's argument that he was unaware that his financial statements were submitted to the bank, he is nevertheless responsible for the acts of his accountant under the general principles of agency law. *Marine Midland Bank v. John E. Russo Produce Co., Inc.,* 50 N.Y.2d 31, 44, 405 N.E.2d 205, 211, 427 N.Y.S.2d 961, 968 (1980). "A principal that accepts the benefits of its agent's misdeeds is estopped to deny knowledge of the facts of which the agent was aware." *Id.* (citations omitted). The debtor acknowledges that Rispler was his accountant and that Rispler prepared his personal financial statements and personal income tax returns. The debtor accepted the loan from the bank and had conversations with bank employees regarding the financial statements, yet made no effort to disavow the financial statements.

Moreover, Kaeblein knew that Rispler was the debtor's accountant. Rispler, as the debtor's accountant, had ostensible authority to act on the debtor's behalf with regard to his financial affairs. When agents act within the scope of their actual or apparent authority, the principal is liable for their acts of fraud. *Am. Society of Mechanical Eng's, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982); *Maritime Ventures Intern., Inc. v. Caribbean Trading & Fidelity, Ltd.,* 689 F.Supp. 1340, 1355 (S.D.N.Y.1988); *In re Lehal Realty Assoc.,* 112 B.R. 601 (Bankr.S.D.N.Y.1990). Manifestly, Rispler acted within the scope of his ostensible authority when he submitted the debtor's financial statements to the bank. Accordingly, the debtor is responsible for Rispler's fraudulent acts.

■ FNYBB relied on the false financial statements when it extended the loans to Statewide. A creditor does not have to prove that the false financial statement was its sole reason for extending loans;

the creditor must show that the fraudulent statement was a substantial factor in causing an extension of credit. *In re Salzman,* 61 B.R. 878 (Bankr.S.D.N.Y.1986). FNYBB has shown, through the testimony of Kaeblein and through documentary evidence including bank memoranda and Line Sheets, that the debtor's fraudulent financial statements were significant considerations supporting its decision to extend credit to Statewide.

 FNYBB's reliance on the false financial statements was reasonable. Courts employ an objective standard in determining whether reliance is reasonable and focus upon the degree of care that a reasonably prudent person would exercise in an average business transaction under similar circumstances. *Galizia,* 108 B.R. 63, 68. Kaeblein visited the real property in Chester County, New York listed on the financial statement as belonging to the debtor. He obtained financial statements from the corporations that the debtor listed as having a substantial equity interest. Representatives from the bank analyzed the financial statements to determine the debtor's outside net worth. As Kaeblein testified, there was nothing in the statements, or otherwise, to indicate that further investigation was necessary. This court has already held that:

> When a bank follows its customary business practice of relying on a credit report and visits the site of specified real estate, as well as relies on the information listed by the debtor in a written financial statement before approving a loan, it should not be ruled that the bank's reliance was unreasonable, especially when there were no facts to put the bank on notice that the information was false.

*In re Hough,* 111 B.R. 445, 450 (Bankr. S.D.N.Y.1990) (citations omitted).

 This court rejects the debtor's argument that the bank did not reasonably rely on the statements because it did not verify all of the information contained therein. Reasonable reliance was made an element in 11 U.S.C. § 523(a)(2)(B) to prevent unscrupulous creditors from inducing debtors to submit false statements so that

they can be later used to object to the debtor's discharge. *Thul v. Ophaug (In re Ophaug),* 827 F.2d 340, 343 (8th Cir.1987); *Hough,* 111 B.R. at 450. The legislative history of 11 U.S.C. § 523(a)(2)(B) does not imply

> that an unscrupulous debtor who intentionally misleads a creditor as to a material fact may excuse the deception by imposing an affirmative duty upon the creditor to conduct a thorough investigation of the false information when the creditor does not know of the falsehood, or where the information on its face is sufficient to reveal the debtor's financial condition, or where the creditor's investigation does not discover the fraud.

*Hough,* 111 B.R. at 450–51 (citations omitted).

### CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(I).

 2. The plaintiff has established by a preponderance of the evidence that the debtor caused to be submitted to the plaintiff materially false financial statements respecting the debtor's financial condition on which the plaintiff reasonably relied and that the debtor caused such financial statements to be made with intent to deceive the plaintiff. The plaintiff has also shown that in reliance on the materially false financial statements, it extended the loans to Statewide, which loans the debtor personally guaranteed.

3. In light of the foregoing, the debtor's obligation to the plaintiff in the sum of $1,427,861.77, as reflected in the state court judgment dated January 3, 1992, is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B).

SETTLE ORDER on notice in accordance with the foregoing.